STEVEN G. KALAR
Federal Public Defender
Northern District of California
DEJAN M. GANTAR
Assistant Federal Public Defender
8th Floor - Suite 820
55 South Market Street
San Jose, CA 95113
Telephone:   (408) 291-7753
Facsimile:   (408) 291-7399
Email:        Dejan_Gantar@fd.org

Counsel for Defendant Daniels

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JEREMY DANIELS,<br><br>Defendant. | **Case No.:** CR 19–709 LHK (NC)<br><br>**DEFENDANT'S MOTION TO REOPEN DETENTION HEARING AND FOR RELEASE ON CONDITIONS**<br><br>**Court:**  Courtroom 5, 4th Floor<br>**Hearing Date:**  April 9, 2020<br>**Hearing Time:**  10:30 a.m. |

**ARGUMENT**

**I.    INTRODUCTION.**

Defendant Jeremy Daniels, by and through counsel, brings this motion to reopen the detention hearing and for an order of release on conditions, in light of the ongoing COVID-19 public health crisis.  Specifically, Mr. Daniels respectfully requests the Court revoke the detention order issued on January 7, and issue a new order permitting pretrial release on conditions.  Alternatively, Mr. Daniels requests the Court issue a new order permitting temporary release because the COVID-19 crisis, combined with Mr. Daniels's medical conditions—rendering him a high-risk person—constitute "compelling reason[s]" under 18 U.S.C. § 3142(i).

**A.    Factual background.**

This case arises out of Mr. Daniels's arrest occurring on November 6, 2019.  On that date, at around 1:40 p.m., San Jose police officer Alexander Cristancho saw Mr. Daniels riding a bicycle in a residential area in San Jose.  According to his police report, Officer Cristancho decided to stop Mr. Daniels because Mr. Daniels "fail[ed] to stop at [a] stop sign limit line" on his bicycle.  Officer Cristancho and his partner, Officer Aponte, pursued Mr. Daniels in their patrol car; the officers pulled up next to Mr. Daniels and told him to stop.  Mr. Daniels asked if he was under arrest, and Officer Cristancho responded "you're about to be."

Mr. Daniels continued riding his bicycle, and Officer Cristancho exited the patrol car to pursue Mr. Daniels on foot, while Officer Aponte continued pursing him in the vehicle.  About one minute later, Officer Aponte pulled his vehicle onto a curb in front of a residential driveway, and abruptly braked to directly block Mr. Daniels, who was still on his bicycle.  Mr. Daniels collided with the vehicle, resulting in injuries.  Mr. Daniels then began to run, and officers pursued.  According to Officer Cristancho's police report, he then saw Mr. Daniels throw two black objects into the air. Officers then tackled Mr. Daniels and arrested him.  Officers located a firearm in the backyard of a home near Mr. Daniels's arrest.

**B.    Mr. Daniels's personal circumstances and medical conditions.**

Mr. Daniels is 38 years old, and is approximately six feet tall and weighs about 305 pounds. *See* Declaration of Dejan M. Gantar, attached hereto as Exhibit A, at ¶ 10.  Based on his body mass

1   index, Mr. Daniels is considered obese.[1]  As reflected in the Pretrial Services Report prepared on

2   January 7, and as explained by defense counsel at the detention hearing, in 2017, Mr. Daniels suffered

3   a gunshot wound to his head.  This injury required a major surgery to remove bullet fragments, leaving

4   Mr. Daniels in the hospital for approximately one month.  *See id.* at ¶ 7.  Following that surgery, Mr.

5   Daniels contracted an infection.  *Id.*   To this day, Mr. Daniels requires additional surgery to remove

6   bullet fragments and gauze that remains inside his head.  *Id.*

7           As defense counsel noted at the detention hearing, Mr. Daniels' pre-existing mental health

8   issues were compounded by the trauma resulting from his head injury, and he has since, and as a result

9   of that incident, been diagnosed with post-traumatic stress disorder ("PTSD") and depression.  He is

10   prescribed medication for both.  *Id.* ¶ 6.  Recently, a physician at Santa Rita jail increased Mr. Daniels'

11   dosage for his medication, as both his depression and PTSD have been triggered by recent events

12   relating to the pandemic and the conditions of the jail.  *Id.*  In addition to meeting with a psychiatrist,

13   who manages his medication once a month, he meets with a counselor at the jail only once a month to

14   manage his PTSD and depression.  *Id.* ¶ 10.

15           Mr. Daniels has experienced episodes of dizziness since his arrest in this case, and a Santa Rita

16   physician noted those could be the result of a possible concussion relating to his arrest, or related to his

17   2017 injury.  *Id.* ¶ 8.  The physician has ordered a CAT scan, however, noted it would be difficult to

18   have one completed as it would require authorization for Mr. Daniels's transport from Santa Rita to a

19   hospital.  *Id.*  Moreover, Mr. Daniels also experiences pain in his knee, for which he has recently

20   received a leg brace.  *Id.*  The physician advised it could possibly be a torn ligament that could require

21   surgery, and has also ordered an MRI.  *Id.*

22       **C.       Procedural background.**

23           On December 19, 2019 the Government filed a one count indictment charging Mr. Daniels with

24   being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), and on December 24, Mr.

25   Daniels initially appeared before the Court.  The Court presided over a detention hearing on January 7,

26   2020 and heard argument from both parties; defense counsel argued for release, in part, based on Mr.

27   Daniels's medical condition and Santa Rita Jail's inability to properly treat him, based on the facility's

28

---

[1] https://www.cdc.gov/obesity/adult/defining.html

1   history of inadequate medical care.  The Court followed Pretrial Service's recommendation, and

2   ordered Mr. Daniels detained on a finding that no condition or combination of conditions could

3   reasonably assure the safety of the community.

4          Mr. Daniels's fiancé and proposed surety, Diana Bailey, was present at the January 7 detention

5   hearing.  Defense counsel has confirmed Ms. Bailey still agrees to serve as a surety and third-party

6   custodian, and that Mr. Daniels may stay with her at their apartment—which is located approximately

7   one mile from the San Jose courthouse—in the event he is released.

## II.   CIRCUMSTANCES HAVE DRAMATICALLY CHANGED SINCE THIS COURT'S DETENTION ORDER, WARRANTING MR. DANIELS'S RELEASE.

### A.   The COVID-19 pandemic and Santa Rita Jail.

10         As Magistrate Judge Hixson recently observed, "[t]hese are extraordinary times."[2]  The

11  COVID-19 pandemic has closed borders, locked down entire countries, halted the entire economy, and

12  killed more than 67,000 people,[3] a statistic that will be outdated by the time this motion is filed.

13  COVID-19 has spread rapidly and aggressively throughout the globe and the Bay Area particularly,

14  dramatically impacting the community's normal way of life.  The State of California has been ordered

15  to shelter in place.  A violation of the California shelter in place order is considered a misdemeanor,[4]

16  and authorities have stepped up enforcement of these restrictions.[5]  Public health experts opine the

17  number of those infected will continue to dramatically increase in the coming weeks.[6]

18         The novel coronavirus can cause severe illness, and in many cases death, for certain high-risk

19  individuals.  Specifically, the elderly and those with underlying health conditions are most at risk.[7]

---

[2] *In the Matter of the Extradition of Alejandro Toledo Manrique*, No. 19-mj-71055-MAG (THS) (N.D. Cal. March 19, 2020), at ECF 115.

[3] https://coronavirus.jhu.edu/map.html

[4] https://www.sfchronicle.com/local-politics/article/Bay-Area-must-shelter-in-place-Only-15135014.php

[5] https://www.kron4.com/news/bay-area/san-francisco-police-to-enforce-shelter-in-place-orders-this-weekend/; https://www.fresnobee.com/news/coronavirus/article241663666.html.

[6] https://www.nytimes.com/2020/03/31/us/politics/coronavirus-death-toll-united-states.html

[7] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-

1   The CDC has continued to expand the class of conditions that render an individual at-risk; they include

2   those with diabetes, heart disease, and severe obesity, amongst other things.[8]  In short, many

3   underlying medical conditions can cause increased complications in the event of infection.

4       The spread of the virus is particularly concerning for those in custodial settings.  Conditions of

5   pretrial confinement create the ideal environment for the transmission of contagious diseases.[9]

6   According to public health experts, incarcerated individuals "are at special risk of infection, given their

7   living situations," and "may also be less able to participate in proactive measures to keep themselves

8   safe."[10]  That's because, much like cruise ships and nursing homes, jails are extremely dangerous

9   during a pandemic, given the impossibility of social distancing in such a confined space.  Indeed, jails

10  are far worse.  As the chief physician for Rikers Island, Dr. Ross MacDonald, explained: "[t]hink of a

11  cruise ship recklessly boarding more passengers each day."[11]  Accordingly, detention facilities around

12  the nation—including Santa Rita—have begun efforts to greatly reduce their populations.[12]

13      Detainees throughout the nation have fallen ill, and even died, as a result of COVID-19.[13]  On

14  March 26, Santa Rita jail publicly announced that a nurse employed at the jail—who had recently

15  treated detainees, and therefore potentially exposed them—tested positive for COVID-19.[14]  And on

16

17  _____

    ncov%2Fspecific-groups%2Fhigh-risk-complications.html

18

    [8] *Id.*

19

20  [9] Joseph A. Bick (2007), Infection Control in Jails and Prisons, *Clinical Infectious Diseases*, *at*
    https://doi.org/10.1086/521910.

21  [10] *Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence,*
22  *and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United*
    *States*, (March 2, 2020), *at* https://bit.ly/2W9V6oS.

23  [11] https://www.washingtonpost.com/nation/2020/03/23/coronavirus-rikers-island-releases/

24  [12] https://www.nbcbayarea.com/news/coronavirus/sheriff-releases-314-inmates-to-reduce-coronavirus-
25  risk-at-alameda-county-jail/2258026/

26  [13] https://www.npr.org/sections/coronavirus-live-updates/2020/04/01/825448006/second-federal-
    inmate-dies-from-covid-19

27  [14] https://www.mercurynews.com/2020/03/26/alameda-county-jail-reports-first-coronavirus-case-a-
    nurse/

28

1  April 4, Santa Rita Jail reported the inevitable: a detainee at the facility had tested positive.[15]  The virus

2  is now—without dispute—actively spreading throughout the facility.

3   Mr. Daniels acknowledges that the jail has implemented policies and procedures in an effort to

4  mitigate the spread of the virus.[16]  However, those policies are inadequate, and particularly so for high-

5  risk people like Mr. Daniels—the recent positive tests at the jail prove as much.  Moreover, the

6  representations made by Santa Rita don't square away with the actual conditions and practices still

7  ongoing within the jail.  The jail is not methodically or aggressively testing current inmates, or even

8  new arrestees that are being admitted into the jail every day.  Instead, the jail is "screening" all new

9  arrestees, *i.e.,* asking them whether they are experiencing COVID-19 symptoms, and taking their

10  temperatures.[17]  So too, the jail is not screening current detainees, taking their temperatures, or asking

11  them if they are experiencing COVID-19 symptoms.  Ex. A, ¶ 3.  Phones the inmates use daily are not

12  being wiped down in between each use.  *Id.* ¶ 3, 8.  While masks were recently distributed to

13  inmates—and provided only to those who *wanted* them—many inmates still go without them.  *Id.* ¶ 8.

14  Similarly, deputies inside the facility are not being diligent in employing protective measures, often

15  pulling their masks down below their chins, or removing them, and reusing the same gloves to inspect

16  multiple inmates' cells.  *Id.* ¶ 4, 8.

17   At Santa Rita, Mr. Daniels resides in a housing unit "pod" with approximately 30 other

18  inmates.  *Id.* ¶ 2.  Of course, social distancing is impossible.  Recently, Mr. Daniels was transported

19  from his housing unit to a holding cell for a medical appointment.  *Id.* ¶ 9.  During that transport, Mr.

20  Daniels was handcuffed to two other inmates, who were *not* from his housing unit.  *Id.*  Mr. Daniels

21  wore a mask; the other inmates didn't.  *Id.*  Mr. Daniels was then placed in a holding cell with those

22  two individuals, while waiting to see the physician.  *Id.*

---

[15] https://www.mercurynews.com/2020/04/04/santa-rita-jail-reports-first-inmate-case-of-covid-19/

[16] On March 30, this Court ordered Wellpath, the contracted medical provider at Santa Rita, to produce to various parties, including the Federal Public Defender's Office, a copy of the jail's "Master Outbreak Control Plan."  *See Babu, et al. v. Ahern, et al.,* Case No. 18-CV-7677 (NC), at ECF 85. (N.D. Cal. March 30, 2020).

[17] Counsel is informed that the jail, in light of the recent positive COVID-19 test, is now "quarantining" new arrestees for 5 days before integrating them with the rest of the jail's population. How or why this practice—in light of the scientific evidence suggesting asymptomatic individuals can spread the virus—is believed to mitigate spread is wholly unclear.

1    These measures prove that Santa Rita is very much the reckless "cruise ship" Dr. MacDonald

2    described.  According to Yale School of Medicine Professor Jaimie Meyer, an expert on infectious

3    diseases, "[i]nadequate screening and testing procedures in facilities increase the widespread COVID-

4    19 transmission."  Declaration of Jaimie Meyer, M.D., attached hereto as Exhibit B, at ¶ 31.  At

5    bottom, an outbreak at the facility was inevitable, and it's now arrived, no doubt facilitated by the lack

6    of testing and inadequate screening procedures in place.  The jail's continued practice of admitting new

7    arrestees without testing them, along with its failure to even screen current detainees, plainly

8    demonstrate that the jail's plan falls short: the CDC has reported that as much as 25% of all COVID-19

9    positive individuals—who are capable of spreading the virus—experience no symptoms,[18] and that

10   people can spread the virus up to 48 hours before showing any symptoms.[19]

11   **B.     The Court should order Mr. Daniels released on conditions.**

12   **1.     Concerns regarding danger to the community have been significantly
            mitigated by the pandemic; similarly, Mr. Daniels has increased incentive**

13   **to comply with the conditions of pretrial release.**

14   The Court ordered Mr. Daniels detained after finding he posed a danger to the community.

15   However, that risk has been significantly mitigated by the ongoing public health crisis.  The shelter in

16   place restrictions limit all citizens' movement and travel throughout the community, and local

17   authorities are beginning to more strictly enforce these restrictions.  Moreover, Mr. Daniels requests

18   the Court order him released on strict conditions, to include 24-hour home detention and location

19   monitoring, adding an additional movement restriction.  In any event, the purpose of Mr. Daniels's

20   request is, in an effort to safeguard his health, to have him removed from an environment in which he

21   cannot practice social distancing, and prevent being exposed to others who may infect him.

22   Put simply, the COVID-19 outbreak has significantly changed the calculus regarding pretrial

23   detention, especially for high-risk individuals like Mr. Daniels.  Mr. Daniels, being high-risk, is much

24   more likely to comply with pretrial release conditions, which is not necessarily true for individuals that

25   are healthy and face lesser risks in the event of infection.  Similarly, being high-risk, Mr. Daniels has a

26   

27   [18] https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html

28   [19] https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-
     months-to-come-this-virus-is-going-to-be-with-us

DEF. MOT. FOR RELEASE
*DANIELS*, CR 19–709 LHK (NC)

7

compelling reason to comply with pretrial release conditions and shelter in place orders, and *stay home*—an incentive that is compounded by the fact that if he violates the terms of his release, he risks returning to Santa Rita Jail. Accordingly, under the Bail Reform Act, this Court can fashion conditions that would reasonably ensure the safety of the community.

### 2. Compelling reasons exist under section 3142(i), meriting Mr. Daniels's temporary release.

The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Several courts throughout the nation have recognized that a defendant's pre-existing medical condition, combined with their continued detention and the potential of a COVID-19 outbreak, warrant temporary release under section 3142(i).[20]

Mr. Daniels respectfully contends release under section 3142(i) is appropriate, because he is high-risk. As an initial matter, Mr. Daniels is obese, which the CDC has made clear is an underlying condition that renders an individual high-risk for complications relating to COVID-19. Moreover, Mr. Daniels suffers from a variety of other medical issues, one of which requires additional surgeries to remove bullet fragments from his head, and continued dizziness episodes, all which may create additional complications in the event he were infected.

---

[20] *See e.g., United States v. Grobman*, No. 18-cr-20989, Dkt. No. 397 (S.D. Fla. Mar. 29, 2020) (releasing defendant in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); *United States v. Mclean*, No. 19-cr-380, Dkt. No. 21 (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Michaels*, 8:16-cr-76, Dkt. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i)); *United States v. Harris*, No. 19-cr-356, Dkt. 35 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic").

1        **3.    Due process also requires Mr. Daniels's temporary release.**

2        A pretrial detainee's freedom from pretrial confinement is a fundamental right protected by the

3    Due Process Clause; any governmental infringement on this right must be narrowly tailored to achieve

4    a compelling government interest. *United States v. Salerno*, 481 U.S. 739, 755 (1987).  The

5    constitutional protections of pretrial detainees arise under the Fifth Amendment Due Process Clause,

6    which provides protection even greater than the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520,

7    535 (1979).  The Eighth Amendment, which applies to persons convicted of criminal offenses, allows

8    punishment as long as it is not cruel and unusual; the Fifth Amendment does not allow any pretrial

9    punishment at all. *Id.*  While the Government has an interest in detaining a defendant to secure his

10   appearance at trial, it may only subject a detainee "to the restrictions and conditions of the detention

11   facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate

12   the Constitution." *Id.* at 536-37; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) (reaffirming

13   the Due Process Clause's prohibition on pretrial punishment).  In addition, pretrial detainees have a

14   substantive due process interest in freedom from deliberate indifference to their medical needs.

15   *Miranda v. City of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

16       Mr. Daniels acknowledges that all inmates and staff at Santa Rita Jail have an increased

17   exposure to the coronavirus.  However, not all of those individuals are equally vulnerable to serious

18   complications, including death, if they contract the virus.  For the reasons described above, Mr.

19   Daniels is one of those individuals.  Similarly, the psychological trauma arising from continued

20   detention through an ongoing pandemic is not experienced equally by all.  Psychologically vulnerable

21   individuals, like Mr. Daniels, will inevitably experience greater mental health distress, as Mr. Daniels

22   already has.  He has been diagnosed with depression and PTSD resulting from his head injury, both of

23   which have been triggered and increased in recent weeks.  As a result, his medications have been

24   increased.  Moreover, the counseling he currently receives to manage those conditions is inadequate.

25   Mr. Daniels's health will likely continue to deteriorate while in detention, in a facility that is ill-

26   equipped to handle mental health crises even under normal circumstances, and certainly ill-equipped to

27   treat an individual that might require intensive care in the event they are infected with the novel

28   coronavirus.

1    At bottom, there is no governmental interest in Mr. Daniel's pretrial detention compelling

2    enough to outweigh the importance of ensuring Mr. Daniels's health, and protecting him from

3    contracting the virus.  Accordingly, Mr. Daniels should be released as a matter of due process.

4                                              **CONCLUSION**

5        As Dr. Robert Greifinger, an expert in health care for prisoners, has explained, "[e]ven with the

6    best-laid plans to address the spread of COVID-19 in detention facilities, the release of high-risk

7    individuals is a key part of a risk mitigation strategy."  Declaration of Robert Greifinger, M.D.,

8    attached hereto as Exhibit C.  For the foregoing reasons, Mr. Daniels respectfully requests the Court

9    revoke the January 7 detention order, and issue a new order permitting pretrial release on conditions.

10   Alternatively, Mr. Daniels requests the Court permit temporary release under section 3142(i).

11

12   Dated:     April 6, 2020                        Respectfully submitted,

13                                                   STEVEN G. KALAR
                                                     Federal Public Defender
14                                                   Northern District of California

15                                                   */s/ Dejan M. Gantar*

16                                                   DEJAN M. GANTAR
17                                                   Assistant Federal Public Defender

18

19

20

21

22

23

24

25

26

27

28

DEF. MOT. FOR RELEASE
*DANIELS*, CR 19–709 LHK (NC)

10

# EXHIBIT A

STEVEN G. KALAR
Federal Public Defender
Northern District of California
DEJAN M. GANTAR
Assistant Federal Public Defender
8th Floor - Suite 820
55 South Market Street
San Jose, CA 95113
Telephone:   (408) 291-7753
Facsimile:   (408) 291-7399
Email:        Dejan_Gantar@fd.org

Counsel for Defendant JEREMY DANIELS

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 19–709 LHK (NC) |
| Plaintiff, | **DECLARATION OF DEJAN M. GANTAR** |
| v. | |
| JEREMY DANIELS, | |
| Defendant. | |

I, Dejan M. Gantar, hereby declare:

1.      I am an Assistant Federal Public Defender for the Northern District of California, San Jose Division.  My office has been appointed to represent defendant Jeremy Daniels in the above-captioned criminal case.

2.      On March 25, 2020, I spoke by phone Mr. Daniels, who remains detained at Santa Rita Jail.  He informed me that he is in a housing "pod" with about 30 other people.

3.      Mr. Daniels further informed me that the phones at the jail, which are used by inmates throughout the day, were not being wiped down between individual uses, and that staff at the Santa Rita staff has not been screening the inmates for potential COVID-19 infections.

4.      On that same date, Mr. Daniels also informed me that the jail staff were not wearing masks, and were not regularly changing their gloves while on duty.  As an example, Mr. Daniels related that several deputies searched the 15 cells in his housing pod recently, but did not change their gloves between any of the inspections.

5.      Mr. Daniels also informed me that he had noticed new arrestees entering his housing unit as recently as March 21 or March 22.

6.      On March 30, I again spoke to Mr. Daniels by phone.  On that date, he informed me that he was prescribed two different medications for his PTSD and depression, and that a physician at the jail had increased the dosage for one of those medications, because his PTSD and depression have been triggered and increasing as a result of the ongoing pandemic and his continued detention.

7.      As Mr. Daniels had explained before, he explained again that he suffered a gunshot wound to his head in 2017.  This injury required a major surgery to remove bullet fragments, leaving Mr. Daniels in the hospital for approximately one month.  Following that surgery, Mr. Daniels contracted an infection.  To this day, Mr. Daniels requires additional surgery to remove bullet fragments and gauze that remains inside his head.

8.      Mr. Daniels also informed me that he has experienced episodes of dizziness since his arrest in this case, and a Santa Rita physician told him that the episodes could be the result of a possible concussion relating to his arrest, or related to his 2017 injury.  The physician has ordered a CAT scan, however, noted it would be difficult to have one completed as it would require authorization to have Mr. Daniels transported from Santa Rita to a hospital.  Moreover, Mr. Daniels also experiences pain in his knee, for which he has recently received a leg brace.  The physician advised it could possibly be a torn ligament that could require surgery, and has also ordered an MRI. Mr. Daniels informed me the phones were still not being wiped down in between uses.  He explained that some inmates were wearing masks, but most were not.  Deputies were wearing masks, however, Mr. Daniels often saw them removing their masks, or pulling them down below their chins when talking to other individuals.

9.      Mr. Daniels explained that before he saw the physician on March 30, he was handcuffed to two other inmates that were not from his housing unit.  Mr. Daniels was the only one of the three

1  who wore a mask.  The three of them were transported together, and then placed in a holding cell while

2  waiting for their individual medical appointments.

3          10.     On April 3, I again spoke to Mr. Daniels by phone.  During that call, Mr. Daniels

4  informed me that he is approximately six feet tall, and currently weighs about 305 pounds.  He further

5  informed me that in addition to the medication he is prescribed, he meets with a psychiatrist and a

6  psychologist about once a month at Santa Rita.

7          I declare under penalty of perjury that the foregoing is true and correct, except for those matters

8  stated on information and belief, and as to those matters, I am informed and believe them to be true.

9          Executed this 6th day of April, 2020, at San Jose, California.

10

11                             Respectfully submitted,

12                             STEVEN G. KALAR
                           Federal Public Defender
13                             Northern District of California

14                                 /S
15                             DEJAN M. GANTAR
                           Assistant Federal Public Defender

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

<u>**Declaration of Dr. Jaimie Meyer**</u>

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:


**I.      Background and Qualifications**

1.  I am Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. I am board certified in Internal Medicine, Infectious Diseases and Addiction Medicine.  I completed my residency in Internal Medicine at NY Presbyterian Hospital at Columbia, New York, in 2008. I completed a fellowship in clinical Infectious Diseases at Yale School of Medicine in 2011 and a fellowship in Interdisciplinary HIV Prevention at the Center for Interdisciplinary Research on AIDS in 2012. I hold a Master of Science in Biostatistics and Epidemiology from Yale School of Public Health.

2.  I have worked for over a decade on infectious diseases in the context of jails and prisons. From 2008-2016, I served as the Infectious Disease physician for York Correctional Institution in Niantic, Connecticut, which is the only state jail and prison for women in Connecticut.  In that capacity, I was responsible for the management of HIV, Hepatitis C, tuberculosis, and other infectious diseases in the facility.  Since then, I have maintained a dedicated HIV clinic in the community for patients returning home from prison and jail. For over a decade, I have been continuously funded by the NIH, industry, and foundations for clinical research on HIV prevention and treatment for people involved in the criminal justice system, including those incarcerated in closed settings (jails and prisons) and in the community under supervision (probation and parole).  I have served as an expert consultant on infectious diseases and women's health in jails and prisons for the UN Office on Drugs and Crimes, the Federal Bureau of Prisons, and others.  I also served as an expert health witness for the US Commission on Civil Rights Special Briefing on Women in Prison.

3.  I have written and published extensively on the topics of infectious diseases among people involved in the criminal justice system including book chapters and articles in leading peer-reviewed journals (including Lancet HIV, JAMA Internal Medicine, American Journal of Public Health, International Journal of Drug Policy) on issues of prevention, diagnosis, and management of HIV, Hepatitis C, and other infectious diseases among people involved in the criminal justice system.

4.  My C.V. includes a full list of my honors, experience, and publications, and it is attached as Exhibit A.

5.  I am being paid $1,000 for my time reviewing materials and preparing this report.

6.  I have not testified as an expert at trial or by deposition in the past four years.

**II.      Heightened Risk of Epidemics in Jails and Prisons**

1

7.  The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected. There are several reasons this is the case, as delineated further below.

8.  Globally, outbreaks of contagious diseases are all too common in closed detention settings and are more common than in the community at large. Prisons and jails are not isolated from communities. Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities. Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities. People often need to be transported to and from facilities to attend court and move between facilities. Prison health is public health.

9.  <u>Reduced prevention opportunities:</u> Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

10. <u>Disciplinary segregation or solitary confinement is not an effective disease containment strategy.</u> Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death. Isolation of people who are ill using solitary confinement also is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other people in prison and staff.

11. <u>Reduced prevention opportunities:</u> During an infectious disease outbreak, people can protect themselves by washing hands. Jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable. Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings. High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons because of a lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

12. <u>Reduced prevention opportunities:</u> During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have

2

access to personal protective equipment, including gloves, masks, gowns, and eye shields. Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak.

13. <u>Increased susceptibility</u>: People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[1] This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.

14. <u>Jails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks.</u> Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplet-borne infectious diseases, people who are infected and ill need to be isolated in specialized airborne negative pressure rooms. Most jails and prisons have few negative pressure rooms if any, and these may be already in use by people with other conditions (including tuberculosis or influenza). Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the illness and caring for those who have become infected much more difficult.

15. <u>Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases.</u> Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases. This includes access to testing equipment, laboratories, and medications.

16. <u>Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care</u> given that the level of care they can provide in the facility itself is typically relatively limited. During an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.

17. <u>Health safety:</u> As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided. As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these conditions. As supply chains become disrupted during a global pandemic, the availability of medicines and food may be limited.

18. <u>Safety and security:</u> As an outbreak spreads through jails, prisons, and communities, correctional officers and other security personnel become sick and do not show up to

---

[1] *Active case finding for communicable diseases in prisons*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

work. Absenteeism poses substantial safety and security risk to both the people inside
the facilities and the public.

19. These risks have all been borne out during past epidemics of influenza in jails and
prisons. For example, in 2012, the CDC reported an outbreak of influenza in 2 facilities
in Maine, resulting in two inmate deaths.[2] Subsequent CDC investigation of 995 inmates
and 235 staff members across the 2 facilities discovered insufficient supplies of influenza
vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for
people who were exposed. During the H1N1-strain flu outbreak in 2009 (known as the
"swine flu"), jails and prisons experienced a disproportionately high number of cases.[3]
Even facilities on "quarantine" continued to accept new intakes, rendering the quarantine
incomplete. These scenarios occurred in the "best case" of influenza, a viral infection for
which there was an effective and available vaccine and antiviral medications, unlike
COVID-19, for which there is currently neither.

## III.   Profile of COVID-19 as an Infectious Disease[4]

20. The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as
COVID-19. The virus is thought to pass from person to person primarily through
respiratory droplets (by coughing or sneezing) but may also survive on inanimate
surfaces. People seem to be most able to transmit the virus to others when they are
sickest but it is possible that people can transmit it the virus before they start to show
symptoms or for weeks after their symptoms resolve. In China, where COVID-19
originated, the average infected person passed the virus on to 2-3 other people;
transmission occurred at a distance of 3-6 feet. Not only is the virus very efficient at
being transmitted through droplets, everyone is at risk of infection because our immune
systems have never been exposed to or developed protective responses against this virus.
A vaccine is currently in development but will likely not be able for another year to the
general public. Antiviral medications are currently in testing but not yet FDA-approved,
so only available for compassionate use from the manufacturer. People in prison and jail
will likely have even less access to these novel health strategies as they become available.

---

[2] *Influenza Outbreaks at Two Correctional Facilities — Maine, March 2011*, Centers for Disease
Control and Prevention (2012),
https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.

[3] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison
Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-
widespread-in-prisons-and-jails-but-deaths-are-few/.

[4] This whole section draws from Brooks J. Global Epidemiology and Prevention of COVID19,
COVID-19 Symposium, Conference on Retroviruses and Opportunistic Infections (CROI),
virtual (March 10, 2020); *Coronavirus (COVID-19)*, Centers for Disease Control,
https://www.cdc.gov/coronavirus/2019-ncov/index.html; Brent Gibson, *COVID-19
(Coronavirus): What You Need to Know in Corrections*, National Commission on Correctional
Health Care (February 28, 2020), https://www.ncchc.org/blog/covid-19-coronavirus-what-you-
need-to-know-in-corrections.

21. Most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection but emerging data from China suggests serious illness occurs in up to 16% of cases, including death.[5]   Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease, and diabetes, and older age.[6]   Death in COVID-19 infection is usually due to pneumonia and sepsis.  The emergence of COVID-19 during influenza season means that people are also at risk from serious illness and death due to influenza, especially when they have not received the influenza vaccine or the pneumonia vaccine.

22. The care of people who are infected with COVID-19 depends on how seriously they are ill.[7]  People with mild symptoms may not require hospitalization but may continue to be closely monitored at home.  People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen.  People with severe symptoms may require ventilation and intravenous antibiotics. Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities.

23. COVID-19 prevention strategies include containment and mitigation.  Containment requires intensive hand washing practices, decontamination and aggressive cleaning of surfaces, and identifying and isolating people who are ill or who have had contact with people who are ill, including the use of personal protective equipment.  Jails and prisons are totally under-resourced to meet the demand for any of these strategies.  As infectious diseases spread in the community, public health demands mitigation strategies, which involves social distancing and closing other communal spaces (schools, workplaces, etc.) to protect those most vulnerable to disease.  Jails and prisons are unable to adequately provide social distancing or meet mitigation recommendations as described above.

24. The time to act is now.  Data from other settings demonstrate what happens when jails and prisons are unprepared for COVID-19.  News outlets reported that Iran temporarily released 70,000 prisoners when COVID-19 started to sweep its facilities.[8]  To date, few state or federal prison systems have adequate (or any) pandemic preparedness plans in

---

[5] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.
[6] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study.*  The Lancet (published online March 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext
[7] *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention (March 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.
[8] *Iran temporarily releases 70,000 prisoners as coronavirus cases surge*, Reuters (March 9, 2020), https://www.reuters.com/article/us-health-coronavirus-iran/iran-temporarily-releases-70000-prisoners-as-coronavirus-cases-surge-idUSKBN20W1E5.

place.[9]  Systems are just beginning to screen and isolate people on entry and perhaps place visitor restrictions, but this is wholly inadequate when staff and vendors can still come to work sick and potentially transmit the virus to others.

## IV.    Risk of COVID-19 in ICE's NYC-Area Detention Facilities

25. I have reviewed the following materials in making my assessment of the danger of COVID-19 in the Bergen, Essex, Hudson, and Orange County jails ("ICE's NYC-area jails"): (1) a declaration by Marinda van Dalen, a Senior Attorney in the Health Justice Program at New York Lawyers for the Public Interest (NYLPI); (2) the report *Detained and Denied: Healthcare Access in Immigration Detention*, released by NYLPI in 2017; and (3) the report *Ailing Justice*: *New Jersey, Inadequate Healthcare, Indifference, and Indefinite Confinement in Immigration Detention*, released by Human Rights First in 2018.

26.  Based on my review of these materials, my experience working on public health in jails and prisons, and my review of the relevant literature, it is my professional judgment that these facilities are dangerously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak, which would result in severe harm to detained individuals, jail and prison staff, and the broader community. The reasons for this conclusion are detailed as follows.

27. The delays in access to care that already exist in normal circumstances will only become worse during an outbreak, making it especially difficult for the facilities to contain any infections and to treat those who are infected.

28. Failure to provide individuals with continuation of the treatment they were receiving in the community, or even just interruption of treatment, for chronic underlying health conditions will result in increased risk of morbidity and mortality related to these chronic conditions.

29. Failure to provide individuals adequate medical care for their underlying chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected.

30. People with underlying chronic mental health conditions need adequate access to treatment for these conditions throughout their period of detention.  Failure to provide adequate mental health care, as may happen when health systems in jails and prisons are taxed by COVID-19 outbreaks, may result in poor health outcomes.  Moreover, mental health conditions may be exacerbated by the stress of incarceration during the COVID-19 pandemic, including isolation and lack of visitation.

---

[9] Luke Barr & Christina Carrega, *State prisons prepare for coronavirus but federal prisons not providing significant guidance, sources say*, ABC News (March 11, 2020), https://abcnews.go.com/US/state-prisons-prepare-coronavirus-federal-prisons-providing-significant/story?id=69433690.

31. Failure to keep accurate and sufficient medical records will make it more difficult for the facilities to identify vulnerable individuals in order to both monitor their health and protect them from infection.  Inadequate screening and testing procedures in facilities increase the widespread COVID-19 transmission.

32. Language barriers will similarly prevent the effective identification of individuals who are particularly vulnerable or may have symptoms of COVID-19. Similarly, the failure to provide necessary aids to individuals who have auditory or visual disabilities could also limit the ability to identify and monitor symptoms of COVID-19.

33. The commonplace neglect of individuals with acute pain and serious health needs under ordinary circumstances is also strongly indicative that the facilities will be ill-equipped to identify, monitor, and treat a COVID-19 epidemic.

34. The failure of these facilities to adequately manage single individuals in need of emergency care is a strong sign that they will be seriously ill-equipped and under-prepared when a number of people will need urgent care simultaneously, as would occur during a COVID-19 epidemic.

35. For individuals in these facilities, the experience of an epidemic and the lack of care while effectively trapped can itself be traumatizing, compounding the trauma of incarceration.

## V.    Conclusion and Recommendations

36. For the reasons above, it is my professional judgment that individuals placed in ICE's NYC-area jails are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected. These harms include serious illness (pneumonia and sepsis) and even death.

37. Reducing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large.

38. As such, from a public health perspective, it is my strong opinion that individuals who can safely and appropriately remain in the community not be placed in ICE's NYC-area jails at this time. I am also strongly of the opinion that individuals who are already in those facilities should be evaluated for release.

39. This is more important still for individuals with preexisting conditions (e.g., heart disease, chronic lung disease, chronic liver disease, suppressed immune system, diabetes) or who are over the age of 60. They are in even greater danger in these facilities, including a meaningfully higher risk of death.

40. It is my professional opinion that these steps are both necessary and urgent. The horizon of risk for COVID-19 in these facilities is a matter of days, not weeks. Once a case of

COVID-19 identified in a facility, it will likely be too late to prevent a widespread outbreak.

41. Health in jails and prisons is community health. Protecting the health of individuals who are detained in and work in these facilities is vital to protecting the health of the wider community.

I declare under penalty of perjury that the foregoing is true and correct.

March 15, 2020
New Haven, Connecticut                                      _____
                                                            Dr. Jaimie Meyer

8

# EXHIBIT A

Jaimie Meyer, MD, MS, FACP

# CURRICULUM VITAE

Date of Revision:        November 20, 2019
Name:                    Jaimie Meyer, MD, MS, FACP
School:                  Yale School of Medicine

## Education:
BA, Dartmouth College Anthropology 2000
MD, University of Connecticut School of Medicine 2005
MS, Yale School of Public Health Biostatistics and Epidemiology 2014

## Career/Academic Appointments:
| | |
|---|---|
| 2005 - 2008 | Residency, Internal Medicine, NY Presbyterian Hospital at Columbia, New York, NY |
| 2008 - 2011 | Fellowship, Infectious Diseases, Yale University School of Medicine, New Haven, CT |
| 2008 - 2012 | Clinical Fellow, Infectious Diseases, Yale School of Medicine, New Haven, CT |
| 2010 - 2012 | Fellowship, Interdisciplinary HIV Prevention, Center for Interdisciplinary Research on AIDS, New Haven, CT |
| 2012 - 2014 | Instructor, AIDS, Yale School of Medicine, New Haven, CT |
| 2014 - present | Assistant Professor, AIDS, Yale School of Medicine, New Haven, CT |
| 2015 - 2018 | Assistant Clinical Professor, Nursing, Yale School of Medicine, New Haven, CT |

## Board Certification:
AB of Internal Medicine, Internal Medicine, 08-2008, 01-2019
AB of Internal Medicine, Infectious Disease, 10-2010
AB of Preventive Medicine, Addiction Medicine, 01-2018

## Professional Honors & Recognition:
### International/National/Regional
| | |
|---|---|
| 2018 | NIH Center for Scientific Review, Selected as Early Career Reviewer |
| 2017 | Doris Duke Charitable Foundation, Doris Duke Charitable Foundation Scholar |
| 2016 | American College of Physicians, Fellow |
| 2016 | NIH Health Disparities, Loan Repayment Award Competitive Renewal |
| 2016 | AAMC, Early Career Women Faculty Professional Development Seminar |
| 2014 | NIH Health Disparities, Loan Repayment Program Award |
| 2014 | NIDA, Women & Sex/Gender Differences Junior Investigator Travel Award |
| 2014 | International Women's/Children's Health & Gender Working Group, Travel Award |
| 2014 | Patterson Trust, Awards Program in Clinical Research |
| 2013 | Connecticut Infectious Disease Society, Thornton Award for Clinical Research |
| 2011 | Bristol Myers-Squibb, Virology Fellows Award |

Jaimie Meyer, MD, MS, FACP

| 2006 | NY Columbia Presbyterian, John N. Loeb Intern Award |
| 2005 | American Medical Women's Association, Medical Student Citation |
| 2005 | Connecticut State Medical Society, Medical Student Award |
| 2000 | Dartmouth College, Hannah Croasdale Senior Award |
| 2000 | Dartmouth College, Palaeopitus Senior Leadership Society Inductee |

## Yale University

| 2014 | Women's Faculty Forum, Public Voices Thought Leadership Program Fellow |

## Grants/Clinical Trials History:

### Current Grants

| Agency: | Center for Interdisciplinary Research on AIDS (CIRA) |
| I.D.#: | 2019-20 Pilot Project Awards |
| Title: | Optimizing PrEP's Potential in Non-Clinical Settings: Development and Evaluation of a PrEP Decision Aid for Women Seeking Domestic Violence Services |
| P.I.: | Tiara Willie |
| Role: | Principal Investigator |
| Percent effort: | 2% |
| Direct costs per year: | $29,993.00 |
| Total costs for project period: | $29,993.00 |
| Project period: | 7/11/2019 - 7/10/2020 |

| Agency: | SAMHSA |
| I.D.#: | H79 TI080561 |
| Title: | CHANGE: Comprehensive Housing and Addiction Management Network for Greater New Haven |
| Role: | Principal Investigator |
| Percent effort: | 20% |
| Direct costs per year: | $389,054.00 |
| Total costs for project period: | $1,933,368.00 |
| Project period: | 11/30/2018 - 11/29/2023 |

| Agency: | Gilead Sciences, Inc. |
| I.D.#: | Investigator Sponsored Award, CO-US-276-D136 |
| Title: | Delivering HIV Pre-Exposure Prophylaxis to Networks of Justice-Involved Women |
| Role: | Principal Investigator |
| Percent effort: | 8% |
| Direct costs per year: | $81,151.00 |
| Total costs for project |  |

Jaimie Meyer, MD, MS, FACP

| | |
|---|---|
| period: | $306,199.00 |
| Project period: | 6/19/2018 - 1/31/2020 |

| | |
|---|---|
| Agency: | NIDA |
| I.D.#: | R21 DA042702 |
| Title: | Prisons, Drug Injection and the HIV Risk Environment |
| Role: | Principal Investigator |
| Percent effort: | 22% |
| Direct costs per year: | $129,673.00 |
| Total costs for project period: | $358,276.00 |
| Project period: | 8/1/2017 - 7/31/2020 |

| | |
|---|---|
| Agency: | Doris Duke Charitable Foundation |
| I.D.#: | Clinical Scientist Development Award |
| Title: | Developing and Testing the Effect of a Patient-Centered HIV Prevention Decision Aid on PrEP uptake for Women with Substance Use in Treatment Settings |
| Role: | Principal Investigator |
| Percent effort: | 27% |
| Direct costs per year: | $149,959.00 |
| Total costs for project period: | $493,965.00 |
| Project period: | 7/1/2017 - 6/30/2020 |

## Past Grants

| | |
|---|---|
| Agency: | NIDA |
| I.D.#: | K23 DA033858 |
| Title: | Evaluating and Improving HIV Outcomes in Community-based Women who Interface with the Criminal Justice System |
| Role: | Principal Investigator |
| Percent effort: | 75% |
| Direct costs per year: | $149,509.00 |
| Total costs for project period: | $821,147.00 |
| Project period: | 7/1/2012 - 11/30/2017 |

| | |
|---|---|
| Agency: | Robert Leet & Clara Guthrie Patterson Trust |
| I.D.#: | R12225, Award in Clinical Research |
| Title: | Disentangling the Effect of Gender on HIV Treatment and Criminal Justice Outcomes |
| Role: | Principal Investigator |
| Percent effort: | 10% |
| Direct costs per year: | $75,000.00 |

Jaimie Meyer, MD, MS, FACP

| | |
|---|---|
| Total costs for project period: | $75,000.00 |
| Project period: | 1/31/2014 - 10/31/2015 |

| | |
|---|---|
| Agency: | Bristol-Myers Squibb |
| I.D.#: | HIV Virology Fellowship Award |
| Title: | Effect of newer antiretroviral regimens on HIV biological outcomes in HIV-infected prisoners: a 13 year retrospective evaluation |
| Role: | Principal Investigator |
| Percent effort: | 10% |
| Direct costs per year: | $34,390.00 |
| Total costs for project period: | $34,390.00 |
| Project period: | 12/1/2011 - 11/30/2012 |

## Pending Grants

| | |
|---|---|
| Agency: | NIMH |
| I.D.#: | R01 MH121991 |
| Title: | Identifying Modifiable Risk and Protective Processes at the Day-Level that Predict HIV Care Outcomes among Women Exposed to Partner Violence |
| P.I.: | Sullivan, Tami |
| Role: | Principal Investigator |
| Percent effort: | 30% |
| Direct costs per year: | $499,755.00 |
| Total costs for project period: | $4,148,823.00 |
| Project period: | 1/1/2020 - 12/31/2024 |

## Invited Speaking Engagements, Presentations, Symposia & Workshops Not Affiliated With Yale:

### International/National

2019:   CME Outfitters, Washington, DC. "A Grassroots Approach to Weed out HIV and HCV in Special OUD Populations"

2019:   US Commission on Civil Rights, Washington, DC. "An Analysis of Women's Health, Personal Dignity and Sexual Abuse in the US Prison System"

2018:   College of Problems on Drug Dependence, College of Problems on Drug Dependence, San Diego, CA. "Research on Women who Use Drugs: Knowledge and Implementation Gaps and A Proposed Research Agenda"

2018:   Clinical Care Options, Washington, DC. "Intersection of the HIV and Opioid Epidemics"

2016:   Dartmouth Geisel School of Medicine, Hanover, NH. "Incarceration as Opportunity: Prisoner Health and Health Interventions"

2010:   Rhode Island Chapter of the Association of Nurses in AIDS Care, Providence, RI. "HIV and Addiction"

Jaimie Meyer, MD, MS, FACP

Regional

2018:   Clinical Directors Network, New York, NY. "PrEP Awareness among Special Populations of
        Women and People who Use Drugs"

2018:   Frank H. Netter School of Medicine, Quinnipiac University, Hamden, CT. "HIV prevention for
        justice-involved women"

2017:   Clinical Directors Network, New York, NY. "Optimizing the HIV Care Continuum for People who
        use Drugs"

2016:   Frank H. Netter School of Medicine, Quinnipiac University, Hamden, CT. "Topics in Infectious
        Diseases"

2016:   Connecticut Advanced Practice Registered Nurse Society, Wethersfield, CT. "Trends in HIV
        Prevention: Integration of Biomedical and Behavioral Approaches"

## Peer-Reviewed Presentations & Symposia Given at Meetings Not Affiliated With Yale:

International/National

2019:   CPDD 81st Annual Scientific Meeting, CPDD, San Antonio, TX. "Punitive approaches to pregnant
        women with opioid use disorder: Impact on health care utilization, outcomes and ethical
        implications"

2019:   14th International Conference on HIV Treatment and Prevention Adherence, IAPAC Adherence,
        Miami, FL. "Decision-Making about HIV Prevention among Women in Drug Treatment: Is PrEP
        Contextually Relevant?"

2019:   2019 NIDA International Forum, NIDA, San Antonio, TX. "Diphenhydramine Injection in Kyrgyz
        Prisons: A Qualitative Study Of A High-Risk Behavior With Implications For Harm Reduction"

2019:   11th International Women's and Children's Health and Gender (InWomen's) Group, InWomen's
        Group, San Antonio, TX. "Uniquely successful implementation of methadone treatment in a
        women's prison in Kyrgyzstan"

2019:   Harm Reduction International, Porto, Porto District, Portugal. "How does methadone treatment
        travel? On the 'becoming-methadone-body' of Kyrgyzstan prisons"

2019:   APA Collaborative Perspectives on Addiction Annual Meeting, APA Collaborative Perspectives
        on Addiction Annual Meeting, Providence, RI. "Impact of Trauma and Substance Abuse on HIV
        PrEP Outcomes among Women in Criminal Justice Systems. Symposium: "Partner Violence:
        Intersected with or Predictive of Substance Use and Health Problems among Women.""

2019:   Society for Academic Emergency Medicine (SAEM), Worcester, MA. "Effects of a Multisite
        Medical Home Intervention on Emergency Department Use among Unstably Housed People
        with Human Immunodeficiency Virus"

2019:   Conference on Retroviruses and Opportunistic Infections (CROI), IAS, Seattle, WA. "Released to
        Die: Elevated Mortality in People with HIV after Incarceration"

2019:   12th Academic and Health Policy on Conference on Correctional Health, 12th Academic and
        Health Policy on Conference on Correctional Health, Las Vegas, NV. "PrEP Eligibility and HIV Risk
        Perception for Women across the Criminal Justice Continuum in Connecticut"

2019:   Association for Justice-Involved Female Organizations (AJFO), Atlanta, GA. "Treatment of
        Women's Substance Use Disorders and HIV Prevention During and Following Incarceration"

2018:    American Public Health Association (APHA) Annual Meeting, American Public Health Association (APHA) Annual Meeting, San Diego, CA. "New Haven Syringe Service Program: A model of integrated harm reduction and health care services"

2018:    12th National Harm Reduction Conference, 12th National Harm Reduction Conference, New Orleans, LA. "Service needs and access to care among participants in the New Haven Syringe Services Program"

2018:    22nd International AIDS Conference, 22nd International AIDS Conference, Amsterdam, NH, Netherlands. "HIV risk perceptions and risk reduction strategies among prisoners in Kyrgyzstan: a qualitative study"

2018:    22nd International AIDS Conference, 22nd International AIDS Conference, Amsterdam, NH, Netherlands. "Methadone Maintenance Therapy Uptake, Retention, and Linkage for People who Inject Drugs Transitioning From Prison to the Community in Kyrgyzstan: Evaluation of a National Program"

2018:    NIDA International Forum, NIDA, San Diego, CA. "HIV and Drug Use among Women in Prison in Azerbaijan, Kyrgyzstan and Ukraine"

2018:    2018 Conference on Retroviruses and Opportunistic Infections (CROI), CROI, Boston, MA. "From prison's gate to death's door: Survival analysis of released prisoners with HIV"

2018:    11th Academic and Health Policy on Conference on Correctional Health, Academic Consortium on Criminal Justice Health, Houston, TX. "Assessing Concurrent Validity of Criminogenic and Health Risk Instruments among Women on Probation in Connecticut"

2017:    IDWeek: Annual Meeting of Infectious Diseases Society of America, Infectious Diseases Society of America, San Diego, CA. "Predictors of Linkage to and Retention in HIV Care Following Release from Connecticut, USA Jails and Prisons (Oral presentation)"

2017:    International AIDS Society (IAS) Meeting, International AIDS Society, Paris, Île-de-France, France. "Late breaker: Predictors of Linkage to and Retention in HIV Care Following Release from Connecticut, USA Jails and Prisons"

2017:    NIDA International Forum, NIDA, Montreal, QC, Canada. "A Mixed Methods Evaluation of HIV Risk among Women with Opioid Dependence in Ukraine"

2017:    International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Montreal, QC, Canada. "Assessing Receptiveness to and Eligibility for PrEP in Criminal Justice-Involved Women"

2017:    International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Montreal, QC, Canada. "A Mixed Methods Evaluation of HIV Risk among Women with Opioid Dependence in Ukraine"

2017:    Annual Meeting of the Society for Applied Anthropology, Society for Applied Anthropology, Santa Fe, NM. "Where rubbers meet the road: HIV risk reduction for women on probation (Oral presentation)"

2016:    International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Palm Springs, CA. "An Event-level Examination of Successful Condom Negotiation Strategies among College Women"

2015:    CDC National HIV Prevention Conference, CDC, Atlanta, GA. "Beyond the Syndemic: Condom Negotiation and Use among Women Experiencing Partner Violence (Oral presentation)"

2015:   International Harm Reduction Conference, International Harm Reduction, Kuala Lumpur, Federal Territory of Kuala Lumpur, Malaysia. "Evidence-Based Interventions to Enhance Assessment, Treatment, and Adherence in the Chronic Hepatitis C Care Continuum"

2015:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, Phoenix, AZ. "Violence, Substance Use, and Sexual Risk among College Women"

2014:   International Women's and Children's Health and Gender Working Group, International Women's and Children's Health and Gender Working Group, San Juan, San Juan, Puerto Rico. "Gender Differences in HIV and Criminal Justice Outcomes"

2014:   College on Problems in Drug Dependence (CPDD), College on Problems in Drug Dependence (CPDD), San Juan, San Juan, Puerto Rico. "Gender Differences in HIV and Criminal Justice Outcomes"

2014:   Conference on Retroviruses and Opportunistic Infections (CROI), Conference on Retroviruses and Opportunistic Infections (CROI), Boston, MA. "Longitudinal Treatment Outcomes in HIV-Infected Prisoners and Influence of Re-Incarceration"

2013:   HIV Intervention and Implementation Science Meeting, HIV Intervention and Implementation Science Meeting, Bethesda, MD. "Women Released from Jail Experience Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study"

2013:   Conference on Retroviruses and Opportunistic Infections (CROI), Conference on Retroviruses and Opportunistic Infections (CROI), Atlanta, GA. "Women Released from Jail Experience Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study"

2012:   IDWeek: Infectious Diseases Society of America Annual Meeting, Infectious Diseases Society of America, San Diego, CA. "Correlates of Retention in HIV Care after Release from Jail: Results from a Multi-site Study"

2012:   IDWeek: Infectious Diseases Society of America Annual Meeting, Infectious Diseases Society of America, San Diego, CA. "Frequent Emergency Department Use among Released Prisoners with HIV: Characterization Including a Novel Multimorbidity Index"

2012:   5th Academic and Health Policy Conference on Correctional Health, 5th Academic and Health Policy Conference on Correctional Health, Atlanta, GA. "Effects of Intimate Partner Violence on HIV and Substance Abuse in Released Jail Detainees"

2011:   IAPAC HIV Treatment and Adherence Conference, IAPAC, Miami, FL. "Adherence to HIV treatment and care among previously homeless jail detainees"


## Regional

2019:   Connecticut Infectious Disease Society, New Haven, CT. "Preliminary Findings from a Novel PrEP Demonstration Project for Women Involved in Criminal Justice Systems and Members of their Risk Networks"

2017:   Connecticut Public Health Association Annual Conference, Connecticut Public Health Association, Farmington, CT. "The New Haven syringe services program"

2014:   Connecticut Infectious Disease Society Annual Meeting, Connecticut Infectious Disease Society, Orange, CT. "Longitudinal Treatment Outcomes in HIV-Infected Prisoners and Influence of Re-Incarceration"

Jaimie Meyer, MD, MS, FACP

2013:     Connecticut Infectious Disease Society Annual Meeting, Connecticut Infectious Disease Society, Orange, CT. "Women Released from Jail Experience Suboptimal HIV Treatment Outcomes Compared to Men: Results from a Multi-Center Study"
2011:     Connecticut Infectious Disease Society Annual Meeting, Connecticut Infectious Disease Society, Orange, CT. "Emergency Department Use by Released Prisoners with HIV"


# Professional Service:

## Peer Review Groups/Grant Study Sections

2019 - present     Reviewer, NIDA, NIH Reviewer: RFA-DA-19-025: HEAL Initiative: Justice Community Opioid Innovation Network (JCOIN) Clinical Research Centers
2019 - present     Reviewer, Yale DCFAR Pilot Projects
2018 - present     Reviewer, Center for Interdisciplinary Research on AIDS (CIRA)
2015 - present     Reviewer, University of Wisconsin-Milwaukee Research Growth Initiative


## Advisory Boards

2017               Advisor, HIV Prevention and Treatment in Cis-Gendered Women, Gilead Sciences, Inc.


## Journal Service

### Editor/Associate Editor

2019 - present     Associate Editor, Journal of the International Association of Providers of AIDS Care (JIAPAC), Section Editor: Sex and Gender Issues


### Reviewer

2019 - present     Reviewer, JAIDS
2012 - present     Reviewer, Addiction Sci and Clin Pract
2012 - present     Reviewer, Addictive Behav Reports
2012 - present     Reviewer, AIDS Care
2012 - present     Reviewer, Social Science and Medicine
2012 - present     Reviewer, SpringerPlus
2012 - present     Reviewer, Substance Abuse Treatment Prevention and Policy
2012 - present     Reviewer, Women's Health Issues
2012 - present     Reviewer, Yale Journal of Biology and Medicine
2012 - present     Reviewer, AIMS Public Health
2012 - present     Reviewer, American Journal on Addictions
2012 - present     Reviewer, American Journal of Epidemiology
2012 - present     Reviewer, American Journal of Public Health
2012 - present     Reviewer, Annals Internal Medicine
2012 - present     Reviewer, BMC Emergency Medicine
2012 - present     Reviewer, BMC Infectious Diseases
2012 - present     Reviewer, BMC Public Health
2012 - present     Reviewer, BMC Women's Health

Jaimie Meyer, MD, MS, FACP

| | |
|---|---|
| 2012 - present | Reviewer, Clinical Infectious Diseases |
| 2012 - present | Reviewer, Critical Public Health |
| 2012 - present | Reviewer, Drug and Alcohol Dependence |
| 2012 - present | Reviewer, Drug and Alcohol Review |
| 2012 - present | Reviewer, Epidemiologic Reviews |
| 2012 - present | Reviewer, Eurosurveillance |
| 2012 - present | Reviewer, Health and Justice (Springer Open) |
| 2012 - present | Reviewer, International Journal of Drug Policy |
| 2012 - present | Reviewer, International Journal of Prisoner Health |
| 2012 - present | Reviewer, International Journal of STDs and AIDS |
| 2012 - present | Reviewer, International Journal of Women's Health |
| 2012 - present | Reviewer, JAMA Internal Medicine |
| 2012 - present | Reviewer, Journal of Family Violence |
| 2012 - present | Reviewer, Journal of General Internal Medicine |
| 2012 - present | Reviewer, Journal of Immigrant and Minority Health |
| 2012 - present | Reviewer, Journal of International AIDS Society |
| 2012 - present | Reviewer, Journal of Psychoactive Drugs |
| 2012 - present | Reviewer, Journal of Urban Health |
| 2012 - present | Reviewer, Journal of Women's Health |
| 2012 - present | Reviewer, Open Forum Infectious Diseases |
| 2012 - present | Reviewer, PLoS ONE |
| 2012 - present | Reviewer, Public Health Reports |

## Professional Service for Professional Organizations

*AAMC Group on Women in Medicine and Science (GWIMS)*

2016 - present    Member, AAMC Group on Women in Medicine and Science (GWIMS)

*American College of Physicians*

2016 - present    Fellow, American College of Physicians
2013 - 2016       Member, American College of Physicians

*American Medical Association*

2005 - present    Member, American Medical Association

*American Medical Women's Association*

2011 - present    Member, American Medical Women's Association

*American Society of Addiction Medicine*

2009 - present    Member, American Society of Addiction Medicine

Jaimie Meyer, MD, MS, FACP

*Connecticut Infectious Disease Society*
2011 - present      Member, Connecticut Infectious Disease Society

*Infectious Disease Society of America*
2008 - present      Member, Infectious Disease Society of America

*InWomen's Network, NIDA International Program*
2013 - present      Member, InWomen's Network, NIDA International Program

*New York State Medical Society*
2005 - 2008      Member, New York State Medical Society

## Yale University Service

*University Committees*
2016 - 2018      Council Member, Leadership Council, Women's Faculty Forum

*Medical School Committees*
2015 - 2016      Committee Member, US Health and Justice Course, Yale School of Medicine
2014 - present      Committee Member, Yale Internal Medicine Traditional Residency Intern Selection
                 Committee

## Public Service

2019 - present      Faculty Member, Yale University Program in Addiction Medicine
2017 - present      Faculty Member, Arthur Liman Center for Public Interest Law, Yale Law School
2013 - present      Mentor, Women in Medicine at Yale Mentoring Program
2012 - present      Faculty Member, Yale Center for Interdisciplinary Research on AIDS
2009 - 2011      Instructor, Preclinical Clerkship Tutor, Yale School of Medicine
2002            Fellow, Soros Open Society Institute
1998 - 1999      Fellow, Costa Rican Humanitarian Foundation

## Bibliography:

## Peer-Reviewed Original Research

1.  **Meyer JP**, Qiu J, Chen NE, Larkin GL, Altice FL. Emergency department use by released prisoners
    with HIV: an observational longitudinal study. PloS One 2012, 7:e42416.
2.  Chen NE, **Meyer JP**, Bollinger R, Page KR. HIV testing behaviors among Latinos in Baltimore City.
    Journal Of Immigrant And Minority Health / Center For Minority Public Health 2012, 14:540-51.
3.  Chitsaz E, **Meyer JP**, Krishnan A, Springer SA, Marcus R, Zaller N, Jordan AO, Lincoln T, Flanigan TP,
    Porterfield J, Altice FL. Contribution of substance use disorders on HIV treatment outcomes and
    antiretroviral medication adherence among HIV-infected persons entering jail. AIDS And Behavior
    2013, 17 Suppl 2:S118-27.

Jaimie Meyer, MD, MS, FACP

4.  Chen NE, **Meyer JP**, Avery AK, Draine J, Flanigan TP, Lincoln T, Spaulding AC, Springer SA, Altice FL. Adherence to HIV treatment and care among previously homeless jail detainees. AIDS And Behavior 2013, 17:2654-66.

5.  Althoff AL, Zelenev A, **Meyer JP**, Fu J, Brown SE, Vagenas P, Avery AK, Cruzado-Quiñones J, Spaulding AC, Altice FL. Correlates of retention in HIV care after release from jail: results from a multi-site study. AIDS And Behavior 2013, 17 Suppl 2:S156-70.

6.  Williams CT, Kim S, **Meyer J**, Spaulding A, Teixeira P, Avery A, Moore K, Altice F, Murphy-Swallow D, Simon D, Wickersham J, Ouellet LJ. Gender differences in baseline health, needs at release, and predictors of care engagement among HIV-positive clients leaving jail. AIDS And Behavior 2013, 17 Suppl 2:S195-202.

7.  **Meyer JP**, Wickersham JA, Fu JJ, Brown SE, Sullivan TP, Springer SA, Altice FL. Partner violence and health among HIV-infected jail detainees. International Journal Of Prisoner Health 2013, 9:124-41.

8.  **Meyer JP**, Qiu J, Chen NE, Larkin GL, Altice FL. Frequent emergency department use among released prisoners with human immunodeficiency virus: characterization including a novel multimorbidity index. Academic Emergency Medicine : Official Journal Of The Society For Academic Emergency Medicine 2013, 20:79-88.

9.  **Meyer JP**, Cepeda J, Springer SA, Wu J, Trestman RL, Altice FL. HIV in people reincarcerated in Connecticut prisons and jails: an observational cohort study. The Lancet. HIV 2014, 1:e77-e84.

10. **Meyer JP**, Zelenev A, Wickersham JA, Williams CT, Teixeira PA, Altice FL. Gender disparities in HIV treatment outcomes following release from jail: results from a multicenter study. American Journal Of Public Health 2014, 104:434-41.

11. **Meyer JP**, Cepeda J, Wu J, Trestman RL, Altice FL, Springer SA. Optimization of human immunodeficiency virus treatment during incarceration: viral suppression at the prison gate. JAMA Internal Medicine 2014, 174:721-9.

12. **Meyer JP**, Cepeda J, Taxman FS, Altice FL. Sex-Related Disparities in Criminal Justice and HIV Treatment Outcomes: A Retrospective Cohort Study of HIV-Infected Inmates. American Journal Of Public Health 2015, 105:1901-10.

13. Boyd AT, Song DL, **Meyer JP**, Altice FL. Emergency department use among HIV-infected released jail detainees. Journal Of Urban Health : Bulletin Of The New York Academy Of Medicine 2015, 92:108-35.

14. Shrestha R, Karki P, Altice FL, Huedo-Medina TB, **Meyer JP**, Madden L, Copenhaver M. Correlates of willingness to initiate pre-exposure prophylaxis and anticipation of practicing safer drug- and sex-related behaviors among high-risk drug users on methadone treatment. Drug And Alcohol Dependence 2017, 173:107-116.

15. Peasant C, Sullivan TP, Weiss NH, Martinez I, **Meyer JP**. Beyond the syndemic: condom negotiation and use among women experiencing partner violence. AIDS Care 2017, 29:516-523.

16. Wickersham JA, Gibson BA, Bazazi AR, Pillai V, Pedersen CJ, **Meyer JP**, El-Bassel N, Mayer KH, Kamarulzaman A, Altice FL. Prevalence of Human Immunodeficiency Virus and Sexually Transmitted Infections Among Cisgender and Transgender Women Sex Workers in Greater Kuala Lumpur, Malaysia: Results From a Respondent-Driven Sampling Study. Sexually Transmitted Diseases 2017, 44:663-670.

17. Hoff E, Marcus R, Bojko MJ, Makarenko I, Mazhnaya A, Altice FL, **Meyer JP**. The effects of opioid-agonist treatments on HIV risk and social stability: A mixed methods study of women with opioid use disorder in Ukraine. Journal Of Substance Abuse Treatment 2017, 83:36-44.

Jaimie Meyer, MD, MS, FACP

18. Rutledge R, Madden L, Ogbuagu O, **Meyer JP**. HIV Risk perception and eligibility for pre-exposure prophylaxis in women involved in the criminal justice system. AIDS Care 2018, 30:1282-1289.

19. Peasant C, Sullivan TP, Ritchwood TD, Parra GR, Weiss NH, **Meyer JP**, Murphy JG. Words can hurt: The effects of physical and psychological partner violence on condom negotiation and condom use among young women. Women & Health 2018, 58:483-497.

20. Loeliger KB, Altice FL, Desai MM, Ciarleglio MM, Gallagher C, **Meyer JP**. Predictors of linkage to HIV care and viral suppression after release from jails and prisons: a retrospective cohort study. The Lancet. HIV 2018, 5:e96-e106.

21. Odio CD, Carroll M, Glass S, Bauman A, Taxman FS, **Meyer JP**. Evaluating concurrent validity of criminal justice and clinical assessments among women on probation. Health & Justice 2018, 6:7.

22. Loeliger KB, Altice FL, Ciarleglio MM, Rich KM, Chandra DK, Gallagher C, Desai MM, **Meyer JP**. All-cause mortality among people with HIV released from an integrated system of jails and prisons in Connecticut, USA, 2007-14: a retrospective observational cohort study. The Lancet. HIV 2018, 5:e617-e628.

23. Loeliger KB, **Meyer JP**, Desai MM, Ciarleglio MM, Gallagher C, Altice FL. Retention in HIV care during the 3 years following release from incarceration: A cohort study. PLoS Medicine 2018, 15:e1002667.

24. Azbel L, Wegman MP, Polonsky M, Bachireddy C, **Meyer J**, Shumskaya N, Kurmanalieva A, Dvoryak S, Altice FL. Drug injection within prison in Kyrgyzstan: elevated HIV risk and implications for scaling up opioid agonist treatments. International Journal Of Prisoner Health 2018, 14:175-187.

25. Peasant C, Montanaro EA, Kershaw TS, Parra GR, Weiss NH, **Meyer JP**, Murphy JG, Ritchwood TD, Sullivan TP. An event-level examination of successful condom negotiation strategies among young women. Journal Of Health Psychology 2019, 24:898-908.

26. Ranjit YS, Azbel L, Krishnan A, Altice FL, **Meyer JP**. Evaluation of HIV risk and outcomes in a nationally representative sample of incarcerated women in Azerbaijan, Kyrgyzstan, and Ukraine. AIDS Care 2019, 31:793-797.

27. Rhodes T, Azbel L, Lancaster K, **Meyer J**. The becoming-methadone-body: on the onto-politics of health intervention translations. Sociology Of Health & Illness 2019, 41:1618-1636.

28. Olson B, Vincent W, **Meyer JP**, Kershaw T, Sikkema KJ, Heckman TG, Hansen NB. Depressive symptoms, physical symptoms, and health-related quality of life among older adults with HIV. Quality Of Life Research : An International Journal Of Quality Of Life Aspects Of Treatment, Care And Rehabilitation 2019.

## Chapters, Books, and Reviews

29. Azar MM, Springer SA, **Meyer JP**, Altice FL. A systematic review of the impact of alcohol use disorders on HIV treatment outcomes, adherence to antiretroviral therapy and health care utilization. Drug And Alcohol Dependence 2010, 112:178-93.

30. **Meyer JP**, Springer SA, Altice FL. Substance abuse, violence, and HIV in women: a literature review of the syndemic. Journal Of Women's Health (2002) 2011, 20:991-1006.

31. **Meyer JP**, Chen NE, Springer SA. HIV Treatment in the Criminal Justice System: Critical Knowledge and Intervention Gaps. AIDS Research And Treatment 2011, 2011:680617.

32. Springer SA, Spaulding AC, **Meyer JP**, Altice FL. Public health implications for adequate transitional care for HIV-infected prisoners: five essential components. Clinical Infectious Diseases : An Official Publication Of The Infectious Diseases Society Of America 2011, 53:469-79.

33. Chen NE, **Meyer JP**, Springer SA. Advances in the prevention of heterosexual transmission of HIV/AIDS among women in the United States. Infectious Disease Reports 2011, 3.

34. **Meyer J**, Altice F.  HIV in Injection and Other Drug Users.  Somesh Gupta, Bhushan Kumar, eds. Sexually Transmitted Infections 2nd ed. New Delhi, India: Elsevier, 2012: 1061-80.  ISBN 978-81-312-2809-8.

35. **Meyer JP**, Althoff AL, Altice FL. Optimizing care for HIV-infected people who use drugs: evidence-based approaches to overcoming healthcare disparities. Clinical Infectious Diseases : An Official Publication Of The Infectious Diseases Society Of America 2013, 57:1309-17.

36. **Meyer J**, Altice F.  Chapter 47, Treatment of Addictions: Transition to the Community.  Robert L. Trestman, Kenneth L. Appelbaum, Jeffrey L. Metzner, eds.  Oxford Textbook of Correctional Psychiatry (Winner of the 2016 Guttmacher Award).  Oxford University Press 2015.  ISBN 9780199360574.

37. **Meyer JP**, Moghimi Y, Marcus R, Lim JK, Litwin AH, Altice FL. Evidence-based interventions to enhance assessment, treatment, and adherence in the chronic Hepatitis C care continuum. The International Journal On Drug Policy 2015, 26:922-35.

38. Mohareb A, Tiberio P, Mandimika C, Muthulingam D, **Meyer J**.  Infectious Diseases in Underserved Populations.  Onyema Ogbuagu, Gerald Friedland, Merceditas Villanueva, Marjorie Golden, eds. Current Diagnosis and Treatment- Infectious Diseases.  McGraw-Hill Medical 2016.

39. **Meyer JP**, Womack JA, Gibson B. Beyond the Pap Smear: Gender-responsive HIV Care for Women. The Yale Journal Of Biology And Medicine 2016, 89:193-203.

40. **Meyer JP**, Muthulingam D, El-Bassel N, Altice FL. Leveraging the U.S. Criminal Justice System to Access Women for HIV Interventions. AIDS And Behavior 2017, 21:3527-3548.

41. Shrestha R, McCoy-Redd B, **Meyer J**.  Pre-Exposure Prophylaxis (PrEP) for People Who Inject Drugs (PWID).  Brianna Norton, Ed.  The Opioid Epidemic and Infectious Diseases.  Elsevier 2019.

42. **Meyer JP**, Isaacs K, El-Shahawy O, Burlew AK, Wechsberg W. Research on women with substance use disorders: Reviewing progress and developing a research and implementation roadmap. Drug And Alcohol Dependence 2019, 197:158-163.


## Peer-Reviewed Educational Materials

43. The Fortune Society Reentry Education Project Detailing Kit.  New York City Department of Health and Mental Hygiene.  October 2014

44. United Nations Office on Drugs and Crime.  Vienna, Austria


## Invited Editorials and Commentaries

45. **Meyer JP**. Capsule Commentary on Pyra et al., sexual minority status and violence among HIV infected and at-risk women. Journal Of General Internal Medicine 2014, 29:1164.

46. Brinkley-Rubinstein L, Dauria E, Tolou-Shams M, Christopoulos K, Chan PA, Beckwith CG, Parker S, **Meyer J**. The Path to Implementation of HIV Pre-exposure Prophylaxis for People Involved in Criminal Justice Systems. Current HIV/AIDS Reports 2018, 15:93-95.

47. **Meyer JP**. The Sustained Harmful Health Effects of Incarceration for Women Living with HIV. Journal Of Women's Health (2002) 2019, 28:1017-1018.

Jaimie Meyer, MD, MS, FACP

Case Reports, Technical Notes, Letters
48.    **Paul J**. Bullous pemphigoid in a patient with psoriasis and possible drug reaction: a case report. Connecticut Medicine 2004, 68:611-5.
49.    How J, Azar MM, **Meyer JP**. Are Nectarines to Blame? A Case Report and Literature Review of Spontaneous Bacterial Peritonitis Due to Listeria monocytogenes. Connecticut Medicine 2015, 79:31-6.
50.    Vazquez Guillamet LJ, Malinis MF, **Meyer JP**. Emerging role of Actinomyces meyeri in brain abscesses: A case report and literature review. IDCases 2017, 10:26-29.
51.    Harada K, Heaton H, Chen J, Vazquez M, **Meyer J**. Zoster vaccine-associated primary varicella infection in an immunocompetent host. BMJ Case Reports 2017, 2017.
52.    Bernardo R, Streiter S, Tiberio P, Rodwin BA, Mohareb A, Ogbuagu O, Emu B, **Meyer JP**. Answer to December 2017 Photo Quiz. Journal Of Clinical Microbiology 2017, 55:3568.
53.    Bernardo R, Streiter S, Tiberio P, Rodwin BA, Mohareb A, Ogbuagu O, Emu B, **Meyer JP**. Photo Quiz: Peripheral Blood Smear in a Ugandan Refugee. Journal Of Clinical Microbiology 2017, 55:3313-3314.


Scholarship In Press
54.    Hoff E, Adams Z, Dasgupta A, Goddard D, Sheth S, **Meyer J**.  Reproductive Health Justice and Autonomy: A systematic review of pregnancy planning intentions, needs, and interventions among women involved in US criminal justice systems.  J Women's Health

# EXHIBIT C

Declaration of Robert B. Greifinger, MD

I, Robert B. Greifinger, declare as follows:

1. I am a physician who has worked in health care for prisoners for more than 30 years. I have managed the medical care for inmates in the custody of New York City (Rikers Island) and the New York State prison system. I have authored more than 80 scholarly publications, many of which are about public health and communicable disease. I am the editor of *Public Health Behind Bars: from Prisons to Communities,* a book published by Springer (a second edition is due to be published in early 2021); and co-author of a scholarly paper on outbreak control in correctional facilities.[1]

2. I have been an independent consultant on prison and jail health care since 1995. My clients have included the U.S. Department of Justice, Division of Civil Rights (for 23 years) and the U.S. Department of Homeland Security, Section for Civil Rights and Civil Liberties (for six years). I am familiar with immigration detention centers, having toured and evaluated the medical care in approximately 20 immigration detention centers, out of the several hundred correctional facilities I have visited during my career. I currently monitor the medical care in three large county jails for Federal Courts. My resume is attached as Exhibit A.

3. COVID-19 is a coronavirus disease that has reached pandemic status. As of today, according to the World Health Organization, more than 132,000 people have been diagnosed with COVID-19 around the world and 4,947 have died.[2] In the United States, about 1,700 people have been diagnosed and 41 people have died thus far.[3] These numbers are likely an underestimate, due to the lack of availability of testing.

4. COVID-19 is a serious disease, ranging from no symptoms or mild ones for people at low risk, to respiratory failure and death in older patients and patients with chronic underlying conditions. There is no vaccine to prevent COVID-19. There is no known cure or anti-viral treatment for COVID-19 at this time. The only way to mitigate COVID-19 is to use scrupulous hand hygiene and social distancing.

5. People in the high-risk category for COVID-19, i.e., the elderly or those with underlying disease, are likely to suffer serious illness and death. According to preliminary data from China, 20% of people in high risk categories who contract COVID-19 have died.

---

[1] Parvez FM, Lobato MN, Greifinger RB. Tuberculosis Control: Lessons for Outbreak Preparedness in Correctional Facilities. Journal of Correctional Health Care OnlineFirst, published on May 12, 2010 as doi:10.1177/1078345810367593.
[2] See https://experience.arcgis.com/experience/685d0ace521648f8a5beeeee1b9125cd, accessed March 13, 2020.
[3] See https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?searchResultPosition=1, accessed March 13, 2020.

6. Those who do not die have prolonged serious illness, for the most part requiring expensive hospital care, including ventilators that will likely be in very short supply.

7. The Centers for Disease Control and Prevention (CDC) has identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age: blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, including diabetes, metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy.

8. Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19. For that reason, public health officials have recommended extraordinary measures to combat the spread of COVID-19. Schools, courts, collegiate and professional sports, theater and other congregate settings have been closed as part of risk mitigation strategy.  At least one nursing home in the Seattle area has had cases of COVID-19 and has been quarantined.

9. The Seattle metropolitan area, hit hard by COVID, is the epicenter of the largest national outbreak at this time. Therefore, it is highly likely, and perhaps inevitable, that COVID-19 will reach the immigration detention facility in Tacoma, Washington. Immigration courts and the ICE field office in Seattle have already closed this month due to staff exposure to COVID-19.

10. The conditions of immigration detention facilities pose a heightened public health risk to the spread of COVID-19, even greater than other non-carceral institutions.

11. Immigration detention facilities are enclosed environments, much like the cruise ships that were the site of the largest concentrated outbreaks of COVID-19. Immigration detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care resources. People live in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection.  Staff arrive and leave on a shift basis; there is little to no ability to adequately screen staff for new, asymptomatic infection.

12. Many immigration detention facilities lack adequate medical care infrastructure to address the spread of infectious disease and treatment of high-risk people in detention. As examples, immigration detention facilities often use practical nurses who practice beyond the scope of their licenses; have part-time physicians who have limited availability to be on-site; and facilities with no formal linkages with local health departments or hospitals.

13. The only viable public health strategy available is risk mitigation. Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. In my opinion, the public health recommendation is to release high-risk people from detention, given the heightened risks

to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage.

14. To the extent that vulnerable detainees have had exposure to known cases with laboratory-confirmed infection with the virus that causes COVID-19, they should be tested immediately in concert with the local health department.  Those who test negative should be released.

15. This release cohort can be separated into two groups.  Group 1 could be released to home quarantine for 14 days, assuming they can be picked up from NWDC by their families or sponsors.  Group 2 comprises those who cannot be easily transported to their homes by their families or sponsors.  Group 2 could be released to a housing venue for 14 days, determined in concert with the Pierce County or Washington State Department of Health.


Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _14th_ day in March, 2020 in New York City, New York.


Robert B. Greifinger, M.D.