UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JEREMY DANIELS,<br>Defendant. | Case No. 19-cr-00709-BLF-1<br><br>**ORDER DENYING MOTION TO SUPPRESS EVIDENCE**<br>[Re: ECF No. 86] |

Before the Court is a motion to suppress evidence brought by Defendant Jeremy Daniels, who is charged in a single-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). ECF No. 86 ("MTS"). Daniels contends that officers of the San Jose Police Department unlawfully detained and seized him on November 6, 2019 and obtained as the fruits of the unlawful seizure a Beretta PX4 semi-automatic handgun, ammunition, related paraphernalia, and statements from Daniels. Daniels seeks to suppress that evidence, and the Government opposes. ECF No. 88 ("Opp."). For the reasons stated below and discussed at the evidentiary hearing held on April 26, 2022, the Court DENIES the motion to suppress.

**I.   BACKGROUND**

On the afternoon of November 6, 2019, San Jose Police Department officers Alexander Cristancho and Steven Aponte were on foot patrol at a homeless encampment near North 17th Street in San Jose. ECF No. 88-1 ("Cristancho Decl.") ¶ 3; ECF No. 88-2 ("Aponte Decl.") ¶ 3. Both Officer Cristancho and Officer Aponte were assigned to the Street Crimes Unit, which is responsible for addressing "homeless encampments, prostitution, street level drug sales, felon apprehension, and anything and everything related to street level narcotics." 4/26 Hrg. Tr. ("Tr.") 6:19–25, 34:1–7. Writing traffic tickets was not usually part of that assignment. *Id.* 21:6–9.

1    While on foot patrol, Officer Cristancho noticed a male subject riding a bicycle. Cristancho Decl. ¶ 3; Tr. 8:18–23.  Officer Cristancho observed the male subject fail to make a complete stop at a stop sign as the suspect turned onto East St. John Street, in violation of Cal. Vehicle Code § 22450(a).  Cristancho Decl. ¶ 3; Tr. 9:3–11.  Officers Cristancho and Aponte got into a patrol vehicle and pursued the male suspect, intending to cite him for the violation of the Vehicle Code, and activated their body-worn cameras.  Cristancho Decl. ¶ 4; Aponte Decl. ¶ 4; *see also* ECF No. 88-3 Exs. B ("Cristancho BWC") & C ("Aponte BWC"); Tr. 9:12–18.  Officer Aponte was driving the vehicle and Officer Cristancho was sitting in the passenger seat.  Tr. 10:6–9.  Officer Aponte moved the vehicle behind the subject and activated the vehicle's lights and siren, but the subject did not stop.  Cristancho Decl. ¶ 4; Aponte Decl. ¶ 4; Tr. 10:13–16.  Officer Aponte pulled up next to the subject, and Officer Cristancho rolled down the passenger side window, cracked open the door, and told the subject to pull over.  Cristancho Decl. ¶ 4; Cristancho BWC 21:40:32–34.[1]  When the subject did not do so, he again told the subject to "pull over" and to "stop."  Cristancho Decl. ¶ 4; Tr. 10:17–19; Cristancho BWC 21:40:34–38.

The subject then turned his head towards Officer Cristancho, who saw him and suspected that he might be Defendant Jeremy Daniels.  Cristancho Decl. ¶ 5; Tr: 11:3–12.  As part of his normal routine that morning while he was in the office prior to his patrol, Officer Cristancho had conducted a records check of known fugitives so that he could become familiar with individuals with outstanding warrants.  Cristancho Decl. ¶ 5; Tr. 7:24–8:3, 31:10–12.  One of the records he checked was that of Daniels, which indicated that Daniels had a no-bail warrant for his arrest for a parole violation.  Cristancho Decl. ¶ 5; *see also id.* Ex. A (copy of Daniels' parole warrant); Tr. 8:4–6, 11:22–12:16.  Daniels' record further indicated that Daniels was a Crip gang member and had a prior firearm-related arrest.  Cristancho Decl. ¶ 5.  Officer Cristancho had mentioned Daniels by name to Officer Aponte during that morning's briefing.  Tr. 42:12–19.  Officer Cristancho had learned of Daniels' arrest warrant several months earlier and had kept track of Daniels ever since.  Tr. 20:5–11.

---

[1] Citations to both officers' bodyworn cameras will cite to the timestamp in the top right corner of the footage.

1    Daniels continued riding his bicycle adjacent to the vehicle and asked if he was under
2    arrest. Cristancho Decl. ¶ 6; Tr. 10:20–21; Cristancho BWC 21:40:38. Officer Cristancho said,
3    "You're about to be." Cristancho Decl. ¶ 6; Tr. 10:24–25; Cristancho BWC 21:40:38–39. As
4    Officer Cristancho exited the vehicle to pursue Daniels on foot, he observed Daniels slow down
5    but fail to fully stop at a second stop sign. Cristancho Decl. ¶¶ 4, 6; Tr. 11:13–20, 25:3–6;
6    Cristancho BWC 21:40:39–43. Daniels sped up on his bicycle, causing the officers to believe
7    Daniels was fleeing. Cristancho Decl. ¶ 6; Tr. 12:20–23, 35:20–24. Officer Cristancho pursued
8    Daniels on foot as Daniels rode his bicycle up the curb and onto the sidewalk. Cristancho Decl.
9    ¶ 6; Tr. 12:24–13:2; Cristancho BWC 21:40:43–53.
10   Officer Aponte, who was still driving the vehicle and pulsing its sirens, lost sight of
11   Daniels as he moved on to the sidewalk due to several parked vehicles in his line of sight as he
12   drove on North 19th Street. Aponte Decl. ¶ 6; Tr. 36:6–8; *see also* Cristancho BWC 21:40:45–50.
13   Believing that Daniels may have gotten off of the bicycle to flee on foot, Officer Aponte
14   accelerated and pulled into the driveway at 230 North 19th Street. Aponte Decl. ¶ 6; Tr. 36:10–
15   37:1; Aponte BWC 21:40:49. Officer Aponte was seeking to set a northbound perimeter to
16   "hamper [Daniels'] ability to escape further in that direction" and proceed to chase Daniels on
17   foot. Tr. 37:2–13. Officer Aponte did not see Daniels as he turned his vehicle because he was
18   looking straight forward, although the stretch of North 19th Street immediately prior to the
19   driveway did not have a vehicle parked on it. Tr. 29:25–30:3; 52:7–16; *see also id.* 51:1–11
20   (Officer Aponte testifying that the cage bars in the rear right window of the police vehicle also
21   obstructed his side vision); Cristancho BWC 21:40:50 (showing that when Officer Aponte began
22   turning, Daniels had not emerged from behind the last parked vehicle on North 19th Street). As
23   Officer Aponte was slowing to a stop in the driveway, the right front end of the police vehicle and
24   Daniels' bicycle collided, causing Daniels to pitch over the front handle bars and fall off the
25   bicycle. Aponte Decl. ¶ 6; Aponte BWC 21:40:52–54. Officer Aponte testified that he did not
26   intend to hit Daniels with his vehicle. Tr. 37:23–25. As Daniels and the vehicle collided, Officer
27   Aponte said, "Damn!" Tr. 37:19–25; Aponte BWC 21:40:54. Daniels immediately got up and ran
28   down the driveway at 230 North 19th Street. Aponte Decl. ¶ 6; Tr. 13:20–22; Cristancho BWC

United States District Court
Northern District of California

3

21:40:53.

Officer Cristancho continued to chase Daniels, giving him multiple commands to "get on the ground." Cristancho Decl. ¶ 7; Tr. 13:23–14:1; Cristancho BWC 21:40:53–57. As Daniels was running down the driveway, he reached into his waistband and threw at least one black object (which split into two pieces) into the air towards the neighboring house at 210 North 19th Street. Cristancho Decl. ¶ 7; Aponte Decl. ¶ 6; Tr. 14:1–4, 38:11–18; Cristancho BWC 21:40:58. Officer Aponte yelled, "He's got a gun!" to warn Officer Cristancho. Aponte Decl. ¶ 7; Aponte BWC 21:41:00–01. Daniels continued to disobey Officer Cristancho's commands to get on the ground, but he was ultimately subdued and handcuffed by both officers. Cristancho Decl. ¶ 8; Tr. 14:15–18, 38:19–25; Aponte BWC 21:41:05–20; Cristancho BWC 21:41:00–20. Upon a search of Daniels, the officers discovered two cell phones and a blue bandana. Cristancho Decl. ¶ 9. Daniels was wearing a blue button-up t-shirt, dark colored jeans, and blue colored shoes. *Id.* Blue is a color representative of Crip gang affiliation. *Id.* As Daniels was restrained on the ground, he complained of trouble breathing. Tr. 64:23–24.

On a search of the neighboring yard by San Jose police officers, officers found in two separate locations in the yard (1) an empty 17-round capacity magazine with the baseplate removed; (2) 14 rounds of 9mm Luger ammunition; (3) a black sock containing a Beretta PX4 Storm 9mm semi-automatic handgun, with the safety in the off position and one round of 9mm Luger ammunition loaded in the chamber; and (4) a baseplate and spring for a magazine. Aponte Decl. ¶ 9; Tr. 14:19–25, 39:10–40:9.

A records check performed on Daniels showed that he was on parole for violation of Cal. Pen. Code § 29800(a), felon in possession of a firearm, and had a no bail warrant for his arrest on a parole violation. Cristancho Decl. ¶ 10. On December 19, 2019, a grand jury returned a single-count indictment charging Daniels with violation of 18 U.S.C. § 922(g)(1). *See* ECF No. 1. Daniels was not cited on the day of the incident for any traffic violations. Tr. 23:14–21.

## II.   DISCUSSION

The Court divides its discussion of the motion to suppress into three distinct issues: (1) whether the officers' stop of Daniels was justified; (2) whether Daniels was seized and subjected

to excessive force when the police vehicle collided with his bicycle; and (3) whether there is a causal nexus between the collision with the police vehicle and the discovery of the evidence Daniels seeks to suppress.

### A. The Officers' Stop of Daniels Was Justified by the Traffic Infractions and Flight

Daniels first argues that the circumstances that preceded the officers confronting him did not give rise to a reasonable suspicion that Daniels was engaged in criminal conduct. MTS at 4–6. Daniels says that there was no reported criminal behavior against him and that "[t]he infraction of passing through a stop sign without completely coming to a stop on a bicycle does not justify the type of stop employed here," particularly "the use of potentially deadly force." *Id.* at 6. Daniels says that the parole warrant out for his arrest would not have justified the use of force because the warrant was "based on a mere failure to appear." *Id.* The Government contends that there was reasonable suspicion supporting a temporary detention of Daniels based on (1) the officers' observing Daniels fail to fully stop at two stop signs, (2) Daniels' outstanding warrant; and (3) Daniels' attempts to evade officers once they told him to stop. Opp. at 6–9. The Court agrees with the Government that the officers were justified in seeking to temporarily detain Daniels.

"Investigatory traffic stops are akin to the on-the-street encounters addressed in *Terry v. Ohio*, 392 U.S. 1 [1969]; accordingly, the same objective standard applies: a police officer may conduct an investigatory traffic stop if the officer has 'reasonable suspicion' that a particular person 'has committed, is committing, or is about to commit a crime.'" *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) (quoting *United States v. Lopez-Soto*, 205 F.3d 1101, 1103 (9th Cir. 2000)). "A traffic violation alone is sufficient to establish reasonable suspicion." *Id.* (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (failure to wear seatbelt in violation of Texas Transportation Code justified custodial arrest). This remains true notwithstanding state limitations on discretionary arrests for such violations. *See People v. McKay*, 27 Cal.4th 601, 607 (2002) (recognizing that no Fourth Amendment violation occurs when an officer has "probable cause to believe that an individual has committed a criminal offense" and performs a custodial arrest, "even one effected in violation of state arrest procedures").

1    Here, the officers were justified in seeking to temporarily detain Daniels because they
2    witnessed two traffic violations in their presence.  Officer Cristancho witnessed Daniels fail to
3    fully stop at a stop sign on his bicycle[2] in violation of California Vehicle Code § 22450(a).
4    Cristancho Decl. ¶ 3; Tr. 9:3–11.  As he and Office Aponte pursued Daniels, they saw him slow
5    down but fail to stop at a second stop sign.  Cristancho Decl. ¶ 4; Tr. 25:3–6.  These two traffic
6    violations alone were sufficient to establish reasonable suspicion justifying a temporary
7    investigatory stop.  *Choudhry*, 461 F.3d at 1100, *Whren*, 517 U.S. at 810.

8    Daniels' flight from officers as they attempted to stop him for the traffic infractions also
9    buttresses the officers' reasonable suspicion.  "[E]vasive behavior is another pertinent factor in
10   determining reasonable suspicion," even if alone it may not be sufficiently indicative of
11   wrongdoing to justify a stop.  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("While flight is not
12   necessarily indicative of ongoing criminal activity, *Terry* recognized that officers can detain
13   individuals to resolve ambiguities in their conduct.").  The Court agrees with the Government that
14   Daniels' attempts to evade Officer Cristancho and Officer Aponte provide additional grounds
15   supporting reasonable suspicion, even if (as the Government concedes) the flight alone may not
16   have.  Officers Cristancho and Aponte pursued Daniels in a marked police vehicle with lights
17   activated, clearly identified themselves as police officers, and told Daniels to stop after observing
18   him commit a traffic infraction.  Cristancho Decl. ¶ 4; Tr. 10:17–19, 25:3–6.  Under those
19   circumstances, it was objectively reasonable to determine that flight was suggestive of
20   wrongdoing, and the flight provided additional reasonable suspicion justifying a temporary stop.

21   The Government also contends that the officers had probable cause to stop Daniels because
22   of the outstanding warrant for his parole violation.  An outstanding warrant does provide probable
23   cause for an arrest.  *See Case v. Kitsap Cnty. Sheriffs Dept.*, 249 F.3d 921, 927–28 (9th Cir. 2001).
24   The Court notes, however, that neither Officer Cristancho nor Officer Aponte testified that the
25   outstanding warrant was one of the reasons they stopped Daniels.  The Government conceded at
26   the hearing that the "main reason" the officers sought to detain Daniels "initially[] was because of

---

[2] Daniels does not dispute the Government's contention that the relevant provision of the California Vehicle Code applies to bicycles just as it does to motor vehicles.

6

the Vehicle Code violation." Tr. 79:19–80:6. Because the Court has already found that reasonable suspicion from the traffic infractions and flight supported the officers' stop of Daniels, the Court need not additionally analyze whether the outstanding warrant would provide additional support in these circumstances.

Daniels primarily points to *United States v. Brown*, 925 F.3d 1150 (9th Cir. 2019), in support of his argument that officers lacked justification for seeking to stop him. In *Brown*, police received an anonymous 911 call stating that a resident at a YWCA in Washington state "saw someone with a gun." *Id.* at 1151. The resident described the man as "a young, black man of medium build with dreadlocks, a camouflage jacket, and red shoes." *Id.* A police officer who was dispatched spotted Brown from his patrol car and began pursuing him without speaking to him first, turning on his patrol lights and driving the wrong way down a one-way street. *Id.* at 1152. Brown ran. *Id.* Two officers pursued him for a block before stopping him at gunpoint and handcuffing him. *Id.* at 1152–53. Officers found a firearm in his waistband and drugs, cash, and other items on his person. *Id.* at 1153.

The Ninth Circuit found that the stop of Brown was not justified. The anonymous tip—which described a man resembling Brown only in the most general of terms—"created at most a very weak inference that he was unlawfully carrying the gun without a license" and was "certainly not enough alone to support a *Terry* stop." *Id.* at 1153–54. Furthermore, the flight from the officer after he activated his patrol car lights was "just one factor in the reasonable suspicion analysis." *Id.* at 1155. Because the officers did not communicate with Brown or tell him to stop before they flashed their lights to detain him, Brown "had no obligation to stop and speak to an officer" and so his flight alone did not justify detention. *Id.* Accordingly, the totality of the circumstances did not add up to reasonable suspicion, and the Ninth Circuit reversed the district court's denial of Brown's motion to suppress. *Id.* at 1157.

*Brown* differs from this case in at least two important respects. First, the officers in this case were not acting on the basis of an anonymous tip. Officer Cristancho himself witnessed Daniels commit a traffic infraction. Cristancho Decl. ¶ 3; Tr. 9:3–11. Both officers witnessed Daniels commit the same traffic infraction again at a second stop sign. Cristancho Decl. ¶ 4; Tr.

7

25:3–6.  The officers' personal observation of the traffic infraction takes this case out of the realm of the concerns about anonymous tips; indeed, the traffic infraction that the officers personally witnessed establishes at least reasonable suspicion.  *Choudhry*, 461 F.3d at 1100.  Second, the officers announced their presence to Daniels before he began to flee.  While the officers in *Brown* did not communicate with Brown prior to Brown fleeing, Officer Cristancho had a brief exchange with Daniels before Daniels began to flee.  Officer Cristancho told Daniels from the window of the police vehicle to "pull over" and to "stop."  Cristancho Decl. ¶ 4; Tr. 10:17–19.  After Daniels asked if he was under arrest, Officer Cristancho said, "You're about to be."  Cristancho Decl. ¶ 6; Tr. 10:20–25.  Only then did Daniels began to speed away on his bicycle in an attempt to flee.  Tr. 11:13–20, 12:20–23, 35:20–24.  Because Officer Cristancho had an exchange with Daniels prior to Daniels fleeing in which he told Daniels to stop, Daniels' flight after that exchange provided additional reasonable suspicion to stop Daniels.  *Wardlow*, 528 U.S. at 124.  *Brown* is thus not persuasive here.

Accordingly, the officers' attempts to stop Daniels were justified by their observation of Daniels committing traffic infractions and Daniels' flight from the officers once they attempted to stop him.

### B. Daniels Was Seized and Subjected to Excessive Force When the Police Car Struck Him

Daniels next argues that he was seized and subjected to excessive force when Officer Aponte struck Daniels with his police vehicle and caused Daniels to fall.  MTS at 6–8.  Daniels says that the use of the vehicle to stop him amounted to potentially deadly force that was not justified by the traffic infractions officers observed him commit.  *Id.*  The Government responds that Daniels was not seized within the meaning of the Fourth Amendment when he collided with the police vehicle and that, even if he was, Officer Aponte's actions were objectively reasonable.  Opp. at 9–12.  The Court finds that although it is a close call, the Government has not met its burden to show by a preponderance of the evidence that a seizure did not occur, and further finds that Officer Aponte used excessive force against Daniels when he hit Daniels with the police vehicle.

8

       **i.    Seizure**

The first step in the Fourth Amendment analysis is determining whether a seizure occurred. A seizure "requires either physical force . . . or, where that is absent, submission to the assertion of authority." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). A "show of authority, such as an order for a suspect to halt[,] . . . does not become [a seizure] unless and until the arrestee complies with the demand." *Id.* In contrast, "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." *Id.* at 1003. Determining whether a seizure occurred is "just the first step in the analysis." *Id.* After determining whether a seizure occurred, courts must then analyze whether the force used to accomplish the seizure was reasonable. *Id.*

Both Daniels and the Government conflate the two types of conduct that can result in a seizure. For example, Daniels contends that "[a]n officer's application of physical force, however slight, results in a Fourth Amendment violation." MTS at 6 (citing *Hodari D.*, 499 U.S. at 621). *Torres* makes clear, however, that neither "[a]ccidental force" nor "force intentionally applied for some other purpose" can precipitate a seizure. *Torres*, 141 S. Ct. at 998. The Government contends that a seizure does not occur until "the police physically subdue the suspect" when the suspect "does not yield . . . in response to a show of authority." Opp. at 10. While that is true for non-physical demonstrations of authority, a seizure may occur "even if the [suspect] does not submit and is not subdued" if an officer applies physical force to a suspect with the intent to restrain. *Torres*, 141 S. Ct. at 998. Because the standard is different for the two types of conduct—shows of authority and application of physical force—and both types of conduct occurred here, the Court analyzes them separately.

First, the officers engaged in a "show of authority," but that show of authority did not amount to a seizure until after Daniels discarded the contraband. An officer has made a "show of authority" when an officer's words and actions would convey to a reasonable person that he was being ordered to restrict his movement." *Hodari D.*, 499 U.S. at 628. After witnessing Daniels run a stop sign, Office Aponte engaged the police vehicle's lights and drove alongside Daniels.

Aponte Decl. ¶ 4; Tr. 10:13–16.  As Officer Aponte pulled alongside Daniels, Officer Cristancho rolled down the passenger side window and told him to pull over.  Cristancho Decl. ¶ 4.  When Daniels did not do so, he again told him to "pull over" and to "stop."  *Id.* ¶ 4; Tr. 10:17–19.  Commands to "pull over" and to "stop" and the use of flashing lights on a police vehicle are no doubt a "show of authority."  *See Hodari D.*, 499 U.S. at 621 (pursuit of suspect with flashing police vehicle lights was "surely an adequate 'show of authority'").  Importantly, however, Daniels fled from this show of authority and was not subdued until after he disposed of the contraband and Officer Cristancho tackled him.  Because a "show of authority" only results in a seizure when the suspect is subdued, *see id.* at 626, the show of authority did not result in a seizure until Officer Cristancho terminated Daniels' movement after Daniels had thrown the contraband.

Second, Officer Aponte used physical force against Daniels after their show of authority.  Officer Aponte collided with Daniels while Daniels was riding his bike, causing Daniels to pitch forward over the handlebars and fall off the bike.  Aponte Decl. ¶ 6; Tr. 37:19–25.  This undoubtedly constituted a use of physical force, but was it a seizure?  The Government contends that the use of force did not amount to a seizure because Officer Aponte did not intend to collide with Daniels.  Opp. at 10–11.  It is true that a seizure involving force only occurs when the force is used "with the intent to restrain," and that "[a]ccidental force will not qualify."  *Torres*, 141 S. Ct. at 998.  But the Court finds that the Government has not met its burden to show by a preponderance of the evidence that Officer Aponte did not intend to restrain Daniels.  Officer Aponte was pursuing Daniels with flashing lights and blaring sirens in the police vehicle.  Although Officer Aponte testified that he could not see Daniels due to several vehicles parked along the curb in his line of sight, Tr. 36:6–8, no cars were parked along the curb immediately before the driveway.  Cristancho BWC 21:40:50.  And Officer Aponte turned into the driveway to get out of his car and with the objective of pursuing and detaining Daniels.  In light of this evidence, the Court finds that the Government has not met its burden to show by a preponderance of the evidence that Officer Aponte did not have the intent to restrain Daniels with his vehicle.  Daniels was thus seized at the moment Officer Aponte's vehicle collided with the bike.

### ii. Use of Force

Because the Court has concluded that Officer Aponte seized Daniels at the moment the vehicle and bike collided, the Court must now determine whether that use of force was excessive. *Torres*, 141 S. Ct. at 1003. Analysis of the reasonableness of force under the Fourth Amendment involves a totality of the circumstances inquiry. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Courts first consider the governmental interests at stake, such as "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Torres v. Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (citing *Graham*, 490 U.S. at 396). On the other side, courts also consider the plaintiff's interests by looking to the "type and amount of force inflicted" and "the severity of injuries" experienced by the plaintiff. *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018). The Court finds that, on balance, the use of force was excessive.

The Court first looks to governmental interests at stake. On the first *Graham* factor—the severity of the crime at issue—the officers testified that they were attempting to detain Daniels for running two stop signs on his bicycle. Tr. 79:19–80:6 ("main reason" the officers sought to detain Daniels "initially[] was because of the Vehicle Code violation"). As noted previously, neither Officer Cristancho nor Officer Aponte testified that the outstanding warrant was one of the reasons they stopped Daniels. *Contra* Opp. at 11 (stating that "the officers knew that the defendant had an outstanding warrant"). This is a minor traffic infraction—indeed, one that occurs no doubt on a daily basis and does not result in police stopping the transgressor. On the second factor—whether Daniels posed an immediate threat to the safety of the officers of others—there is no evidence that Daniels endangered anyone when he ran the stop signs with his bicycle. *Id.* Running stop signs on a bicycle is not indicative of dangerousness. On the third factor—resisting or evading arrest— the Court finds that the Government has established by a preponderance of the evidence that Daniels was evading arrest. Officer Cristancho told Daniels to "pull over" and to "stop." Cristancho Decl. ¶ 4; Tr. 10:17–19. After Daniels asked if he was under arrest, Officer Cristancho said, "You're about to be." Cristancho Decl. ¶ 6; Tr. 10:20–25. Only then did Daniels began to speed away on his bicycle, as Officer Aponte followed in a police vehicle with sirens and lights

activated. Aponte Decl. ¶ 4; Tr. 10:13–16. Despite the third factor, these factors on balance favor Daniels given the minor infractions for which the officers sought to detain him.

As to Daniels' interest factors—the type and amount of force used and the injuries inflicted—they further weigh in Daniels' favor. Although Daniels was not seriously injured by the collision, the use of a vehicle to seize an individual for two bicycle infractions was excessive force. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985). It is clear that vehicles can inflict deadly force on individuals. *United States v. Aceves-Rosales*, 932 F.2d 1155, 1157 (9th Cir. 1987) ("[I]t is undisputed that an automobile can inflict deadly force on a person and that it can be used as a deadly weapon."). Even though the collision here did not occur at high speed, the use of the vehicle "constitute[d] at least intermediate and potentially deadly force." *Gonzales v. City of San Jose*, 2020 WL 5407993, at *3 (N.D. Cal. Sep. 9, 2020) (citing, *inter alia*, *Saetrum v. Vogt*, 673 F. App'x 688, 690 (9th Cir. 2016) ("[C]ases from this and other circuits clearly establish that using a car as an impact weapon constituted at least a significant, intermediate level of force.")).[3] Use of a police vehicle to seize someone who officers had observed run two stop signs was disproportionate and excessive in light of this clear case law.

Accordingly, the Court finds that Officer Aponte seized Daniels and used excessive force against him when his vehicle and the bicycle collided.

### C. Causal Nexus Between the Collision and Discovery of the Evidence

The Government next argues that even if Daniels was seized and Officer Aponte used excessive force against him by colliding with him with the police vehicle, there was no causal nexus between the excessive force and discovery of the evidence because the gun paraphernalia did not dislodge from Daniels when the collision occurred. Opp. at 12–13. Daniels does not specifically address this issue. The Court agrees with the Government.

---

[3] For this reason, the Government's attempts to distinguish *Brower v. Cnty. of Inyo*, 489 U.S. 593 (1989) (in which a tractor-trailer was used as a roadblock in a high-speed chase) as a case involving more dangerous facts than here are not persuasive. *See* Opp. at 11–12.

First, the seizure of Daniels when the police car collided with his bicycle was only momentary in length.  Even though "the slightest application of force" with intent to detain constitutes a seizure, "despite the arrestee's escape," that is "not to say that for Fourth Amendment purposes there is a *continuing* arrest during the period of fugitivity." *Hodari D.*, 499 U.S. at 625. "[A] seizure by force—absent submission—lasts only as long as the application of force." *Torres*, 141 S. Ct. at 999 ("The fleeting nature of some seizures by force undoubtedly may inform . . . what evidence a criminal defendant may exclude from trial.").  The application of force to Daniels lasted only as long as the police vehicle was in contact with him, and certainly no longer than when he lay momentarily on the ground after the collision.  There is no dispute that Daniels immediately got up and ran down the driveway after the police car collided with him.  Aponte Decl. ¶ 6; Tr. 13:20–22; Cristancho BWC 21:40:53.  Importantly, it is undisputed that neither the gun or other contraband was dislodged during the seizure, nor came into plain view.  Under *Hodari D.* and *Torres*, the seizure thus ended when Daniels got up and began running down the driveway.

Where the discovery of contraband is not "causally related" to a Fourth Amendment violation, suppression of the evidence is not warranted.  *United States v. Ankeny*, 502 F.3d 829, 837–38 (9th Cir. 2007) (guns discovered in plain sight during search pursuant to valid warrant would not be suppressed, even though manner of executing the search was in violation of Fourth Amendment); *see also United States v. McClendon*, 713 F.3d 1211, 1215–17 (9th Cir. 2013) (handgun thrown away by defendant after show of authority but prior to termination of his movement and would not be suppressed because handgun was not the fruit of a seizure); *Hodari D.*, 499 U.S. at 629 (cocaine abandoned by defendant while running from show of authority would not be suppressed because it was not the fruit of a seizure).  Here, Daniels discarded the contraband of his own volition as he ran down the driveway.  This was after the seizure had terminated and Daniels was in a "period of fugitivity." *Hodari D.*, 499 U.S. at 625.  If the vehicle–bike collision had, for example, resulted in the contraband flying from Daniels' body and scattering on the ground, this might be a different case.  But that did not happen, and Daniels cast away the gun paraphernalia himself as he was running from officers.

The discovery of the evidence was not causally related to the seizure, so suppression of the evidence is not warranted.

### III. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Daniels' motion to suppress is DENIED.

Dated: May 16, 2022

BETH LABSON FREEMAN
United States District Judge